BERTHA ROACH SMITH ET AL., APPELLEES, V. PACIFIC MU-
TUAL LIFE INSURANCE COMPANY: CLARA C. ROACH, APPEL-
LANT.

FILED FEBRUARY 28, 1936.   No. 29456.

*Robert G. Simmons* and *W. B. Sadilek,* for appellant.

*George I. Craven, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY and
CARTER, JJ., and CHASE, District Judge.

CHASE, District Judge.
This is a suit in equity for the recovery of the proceeds
of a life insurance policy, which is admitted by the parties
to be the sum of $1,422.98. It was begun as an action at
law. The insurance company, by way of interpleader, se-

cured an order making the defendant Clara C. Roach a party. The insurance company, by agreement of parties, paid the money into court, and the case was then transferred to the equity docket and tried as a suit in equity. So far as this proceeding is concerned, the interest of the insurance company is terminated and the controversy is now between the three daughters of the insured by a former marriage and his widow. Hereafter, for convenience, we shall refer to the daughters as plaintiffs, and to the widow as defendant.

The facts may be epitomized as follows: The insured, Roy V. Roach, by a former marriage, had three daughters, who are the plaintiffs, and the defendant is his second wife. The Pacific Mutual Life Insurance Company issued a policy of insurance upon the life of the assured. The policy is dated September 28, 1925, and one Estella Ann Roach, his wife, was made the beneficiary. Estella Ann Roach died and he subsequently married the defendant. On February 18, 1929, by proper indorsements on the policy, he substituted as joint beneficiary the plaintiffs and the defendant. On August 14, 1931, at the request of the assured, one James W. McKee, his son-in-law, was named as beneficiary, or, in the event of his death before the assured, then the intention was that the immediately previous beneficiaries were to receive the benefits under the policy. On January 18, 1932, upon written request of the insured, the company changed the beneficiary from James W. McKee to the defendant. The assured in his request therefor stated that he no longer owed his son-in-law anything and desired the change to be made. On February 6, 1932, the assured inquired of the company by letter if, in the event he and his wife should both (using his language) "get bumped off in a wreck," the insurance money as it was then fixed would be paid to his daughters or to his wife's sister. He stated further that, in case of his wife's death, he did not desire any of the proceeds to be paid to her people whom he had never seen. On March 11, 1932, at the request of the assured, by proper indorsements thereon, the beneficiary was

again changed to his three daughters, excluding his wife. In his letter to the company in which the change was sought, he directed the company not to mail the policy to Schuyler, where he lived, but to mail it to his daughter, Mrs. C. B. Yoder, at her address in Omaha, stating that he would get the mail and the policy from there. The policy, at the insured's direction, was delivered to Mrs. Yoder. About a year later the defendant, on behalf of the assured, wrote a letter to the company which the assured signed, making a request to change the beneficiary back to the defendant. This letter was followed by a formal application for change of beneficiary, dated May 20, 1933. Considerable correspondence followed between the assured and the company concerning the proposed change of beneficiary, most of which was written by the defendant, to which the assured merely attached his signature. The company at this time informed the assured that it was unable to comply with the request for the reason that he did not inclose the policy upon which to make the indorsement. In the meantime Mrs. Yoder had moved from Omaha to California and had delivered the policy to her sister, Mrs. Smith, who resided in Lincoln. On learning of the location of the policy the insured, whose health was then considerably impaired, was named as plaintiff in an action in replevin, in which the possession of the policy was sought. A writ of replevin followed and the policy thereunder was delivered to the plaintiff therein. When the policy was taken from Mrs. Smith under the writ of replevin, the company was notified in writing by the attorney for plaintiffs that they were the owners of the policy and if the company changed the beneficiary it would do so at its peril. The replevin action was never tried, and no further change of beneficiary was ever indorsed upon the policy. The assured died on October 19, 1933. The trial court found that the title to the policy and the proceeds involved herein were in the plaintiffs by virtue of a gift to them by the assured in his lifetime. From this ruling the defendant brings the case here for review.

Several assignments of error are urged for reversal.

The first to be considered is: Does the record show facts upon which to predicate a gift *inter vivos*?

The defendant claims that the evidence is not sufficient to constitute a gift of the policy; that the record shows the assured at all times intended to keep and retain the title thereto, and while he had such title, and in his lifetime, he undertook to change the beneficiary from the plaintiffs to her; that he was prevented from so doing by the plaintiffs holding possession thereof, and his death occurred while he retained such intention; that she is the owner of the equitable interest of the fund in question and is the real beneficiary under the policy and is entitled to the proceeds.

To establish a gift *inter vivos* two elements are necessary —an unconditional delivery of the property on the part of the donor, coupled with the intention to relinquish all further dominion over the same by him, and to vest full and complete title in the donee.

To determine the intention of the assured in this connection, an intensive study of the facts as shown by the record is necessary. It appears that the assured, shortly after his first wife's death, married the defendant, who was a spinster. The relationship between the second wife and the daughters was not exceptionally friendly, and, as the years passed, the ill feeling grew more pronounced. With this disagreeable situation confronting him, the assured felt an obligation to mollify the malcontents as far as he was able to do so, and to that end he admitted that he resorted to duplicity on several occasions as a nostrum for this unhappy domestic situation. When he was considering the change of the beneficiary from his wife to his daughters he informed the company by letter that he must be very careful how this is done as some one (using his words) "relays the mail." He also states that he is naming the daughters the beneficiary under the present policy since he has another policy of $2,000 which he has made payable to his wife. When the change of beneficiary is made to the daughters, he directs the company to keep the policy until he calls for it, or have it delivered to Mrs. Yoder; that he is contemplat-

ing a visit to Omaha. On March 2, 1932, he mails the policy to the company for the change of beneficiary, and in the letter accompanying it he uses the following statement: "Please do not mail the policy to Schuyler. Mail to 1335 South 36th c/o Mrs. C. B. Yoder. I will get the mail and policy from there." Upon receipt of this letter the company mailed the assured a beneficiary form for signature which the assured filled out, changing the beneficiary and returning the form, properly executed, to the company, and in the letter transmitting the form he again states: "Please be sure and mail policy to Mrs. C. B. Yoder, 1335 So. 36th, Omaha. Thanks." In accordance with the direction the policy was delivered to Mrs. Yoder.

Mrs. Yoder testified that the assured later visited at her home, where, in a conversation had with her, he informed her he had made the policy payable to the three girls, leaving his wife out; that he had made provision for the wife in another policy; that the policy in this suit would be delivered to the witness; and that the plaintiffs were to take and keep it; that it was for the girls, and the witness was not to give out any information concerning it; that if Clara knew she had been cut out she would (using his language) "raise hell" and try and have him get it back. Mrs. Yoder states that she told her father she would receive the policy; and which was later delivered to her, and she kept it and he never called for it again. Mrs. Yoder, in 1932, moved from Omaha to California, at which time she delivered the policy in question to her sister, Mrs. Smith, at Lincoln. Later Mrs. Yoder returned from California and had a conversation with her father at Schuyler in which she testified he informed her there was considerable trouble about the policy but it was all right the way it was and that there was no reason why his wife should have any of it. He wanted the plaintiffs to have it; stating further the second marriage had not been as felicitous as he had anticipated; that he was sorry he married the second time; that after the witness leaves his home his wife will spend half the night pumping him trying to find out what they talked about.

Mrs. Smith testifies, in a conversation had with her father after the policy had been delivered, he stated that the policy "belongs to you girls; it is in Omaha; you look after it and keep it and use it to look after the land. * * * Clara is not to know." Later he wrote a letter to Mrs. Smith, which is part of the record, in which he states the policy is made out to you girls and Clara does not know this, nor is she to know it; requesting that they do not give away the fact as to whom the policy is made out; that he had borrowed $250 on the policy before he made the change of beneficiary to the plaintiffs. He had an arrangement with his daughters whereby it was understood between them that, in the event any dispute or argument arose between the plaintiffs and the defendant, he was to take the wife's side, in order not to incur her displeasure, since he was the one who had to live with her after the daughters were gone.

We think the facts as presented by the record warrant the conclusion that it was the intention of the insured to make a gift of the policy in question to his three daughters; that such intention was consummated by a complete delivery of it to them; that upon such delivery his dominion and title over the policy and the proceeds arising thereunder ceased.

It is claimed that the title to a life insurance policy cannot be made the subject of transfer by way of gift *inter vivos* so as to vest the beneficial interest therein in the donee.

The law is well settled in cases of gifts *inter vivos* that the only delivery of the subject of the gift necessary is such as the nature of the property will reasonably admit. The rule applied to gifts *inter vivos* as expressed in the earlier decisions seems to have been somewhat relaxed in later years in order to keep pace with growing business conditions. In applying the more modern rule the courts inquire into the species of the property which is made the subject of the gift, as well as the manner in which the gift is executed. *Crook v. First Nat. Bank,* 83 Wis. 31, 52 N. W. 1131. Originally gifts *inter vivos* were limited with considerable

strictness. to chattles that were the immediate subject of manual delivery. Influenced by the expansion of commercial activities the rule has been extended to cover securities, such as bank notes payable to bearer, lottery tickets, indorsed bonds and other choses in action represented by certificates where the equitable interest only could be assigned. This rule is supported by the theory that a bank note, security, or chose in action represents some valid and subsisting obligation for the payment of a given sum of money, and the giving and delivery of the evidence of the debt, or the instrument that shows its existence, is, in effect, a gift of the money. *Basket v. Hassell,* 107 U. S. 602, 27 L. Ed. 500; *Schollmier v. Schoendelen,* 78 Ia. 426, 43 N. W. 282.

No particular words are necessary to constitute such a gift, the essential ingredients being the intention of the donor, coupled with as effectual and complete a delivery as the species of the property will admit, intending thereby to relinquish all future dominion over the same. *Skobis v. Ferge,* 102 Wis. 122, 78 N. W. 426.

The more modern doctrine has been recognized by this court wherein it held that the mere delivery of a receipt to the donee for bonds which had been left by the donor for safe-keeping, with the intention of making a gift to the donee, is sufficient. *Kaufmann v. Parmele,* 99 Neb. 622, 157 N. W. 342.

The cases where life insurance policies are sought to be made the subject of gifts *inter vivos* are not so numerous. It has been held that one who takes a policy of insurance upon his life may make a valid gift of the proceeds to another by the delivery of the policy, even though the policy provides that an assignment of it must be made in writing and filed in the office of the insurer. *Opitz v. Karel,* 118 Wis. 527, 95 N. W. 948, 62 L. R. A. 982. If stocks, bonds, and other evidences of indebtedness are recognized by the courts as the proper subjects of gifts *inter vivos,* we can perceive of no logical reason why the doctrine cannot be extended to policies of life insurance. Like other evidences of indebtedness, it represents an existing contractual obli-

gation in force, wherein the insurer, for a valuable consideration, agrees to pay to a third person a certain sum, fixed by the contract, upon the happening of the event of death. The power to transfer the benefits under the policy in the manner designated by the contract would, in all reason, give the insured also the power to dispose of the same by gift, if such transfer meets all other requirements of gifts *inter vivos,* and the title to the fund would vest, at its maturity, in the donee in the same manner as gifts of other like species of property. *Travelers Ins. Co. v. Grant,* 54 N. J. Eq. 208, 33 Atl. 1060; *Hogue v. Minnesota Packing & Provision Co.,* 59 Minn. 39, 60 N. W. 812; *Marcus v. St. Louis Mutual Life Ins. Co.,* 68 N. Y. 625; *Crittenden v. Phoenix Mutual Life Ins. Co.,* 41 Mich. 442, 2 N. W. 657.

Another claim the defendant makes is that the husband cannot pass title to a life insurance policy, citing section 44-1118, Comp. St. 1929. It is claimed that under this section of the statute there can be no pledge or assignment of a policy of life insurance except as security for debt.

This statute merely provides that the insured may sell or surrender a policy to the company, or pledge or assign the same to the company, or assign the same as security for a debt, without the consent of the beneficiary, unless the appointment of such beneficiary is irrevocable.

We are unable to place any interpretation on this statute which would preclude the insured from making a gift of a life insurance policy. The fact that it provides that a policy may be assigned as security for debt does not, of itself, exclude any other method or reason for transferring title thereto. We are aware of no canon of statutory construction that would justify a court in placing such an interpretation on this statute.

Another claim made by the defendant is that the only manner in which an interest or title in an insurance policy can be assigned is by complying strictly with the terms of the policy. The rule is too well settled to admit of further argument that the provisions for the change of beneficiaries and assignment of insurance policies stipulated in the con-

tract are made primarily for the benefit of the insurer. If the insurer waives, or does not seek to raise a question of the method of assignment, it cannot be raised by beneficiaries. *Opitz v. Karel, supra; Hewins v. Baker,* 161 Mass. 320, 37 N. E. 441.

It is claimed by the defendant that a husband cannot make an assignment, even for collateral security, of a policy of life insurance payable to his wife, without her consent or knowledge, citing *Norfolk Nat. Bank v. Flynn,* 58 Neb. 253, 78 N. W. 505. This case holds that from the record it had before it the facts were not sufficient to constitute an assignment of the policy on behalf of the insured as security for a debt. The policy involved was one where the husband was the insured and the wife his beneficiary. The plaintiff contended that the husband made an assignment to it of the policy to secure a debt. In discussing the question of whether or not the evidence was sufficient to show assignment, the commissioner did digress into a discussion in which he seems to indicate that, before valid assignment of this policy could have been made to secure the debt, the wife's consent was required. Obviously this question was not necessarily before the court, and at most is mere dictum, since the court held that the evidence was insufficient to show that the husband had intended to make an assignment of the policy. If a husband cannot legally make any other person except his wife the beneficiary in a policy of insurance upon his life, and cannot assign the policy as security for debt without his wife's consent, then it would follow that the wife would be made the exclusive beneficiary of the husband's life insurance. This principle we cannot indorse as now being, or ever having been, the law of this state.

The trial court is charged with error for permitting the plaintiffs to testify relating to conversations and transactions had with the insured, who was deceased at the time of the trial, claiming that section 20-1202, Comp. St. 1929, excludes such testimony.

This statute provides that a person having a direct legal

interest in the result of a civil action or proceeding will not be permitted to testify to any transaction, or conversation had with a deceased person, when the adverse party is a representative of such deceased person.

At the very outset it is apparent that the statute is not applicable to the situation presented here. It is true the plaintiffs have a direct legal interest in the controversy, but the defendant is not the representative of a deceased person within the meaning of the statute. Whatever interest the defendant may have in the subject of this litigation is not based upon her representation of a deceased person. Her rights are based on a written obligation which matured at his death, an obligation which the deceased never had in his lifetime, and never could have been enforced by him. It came into existence upon his death, as an original obligation. The cases cited by the defendant in support of her theory are not in point, as in both of these cases the rule applied is such that the statute only becomes applicable where one party is called upon to defend or assert title or interest in property, which the deceased person could have asserted, or defended, had he been living. This statute cannot be extended so as to apply to the testimony of plaintiffs. Were it of such a character as to come within the statute, at the time it was received the defendant made no objection thereto, and further, in presenting her side of the case, waived the right by offering testimony as to transactions and conversations had with the same deceased party.

From a careful examination of the entire record, we must conclude that the trial court reached the proper conclusions of fact and applied the proper rules of law thereto. The case is, in all respects

AFFIRMED.