MELVIN L. RALSTON, ADMINISTRATOR, APPELLANT, V. LEE W.
MARGET ET AL., APPELLEES.

293 N. W. 124

FILED JUNE 28, 1940. No. 30866.

*Waring & Waring,* for appellant.

*Sloans, Keenan & Corbitt, contra.*

Heard before ROSE, PAINE, CARTER, MESSMORE and JOHN-
SEN, JJ.

PAINE, J.

Plaintiff, who is appellant, filed petition to foreclose a
real estate mortgage. Defendants denied that they owed the
note which the mortgage was given to secure, alleging that
it was voluntarily canceled, satisfied, forgiven, and de-
stroyed by the payee, Lillian I. Marget. Trial court found
generally for the defendants, and ordered said mortgage re-
leased of record. Plaintiff appeals, and alleges that the
findings and judgment are not sustained by the evidence.

The petition shows that the defendants, Lee W. Marget
and his wife Nellie, gave a promissory note for $4,000 to
Lillian I. Marget, the mother of Lee W. Marget. Said note
was dated March 1, 1928, and matured March 1, 1933, with
interest at 5 per cent. To secure the payment of this note,
the makers gave a first mortgage on 80 acres of land in
Fillmore county.

The petition further alleges that Lillian I. Marget kept
said note and mortgage in a safety deposit box in the

Farmers State Bank of Fairmont, Nebraska; that after her death on December 30, 1938, her son, Lee W. Marget, was appointed administrator of her estate, but later, upon his resignation, Melvin L. Ralston, the plaintiff, was appointed administrator *de bonis non,* and charges that Lee W. Marget has refused to turn over said note and mortgage to him. Plaintiff alleges that the maker has never paid any part of the principal sum due thereon, and the same is due and payable to his mother's estate.

The defendants in their answer allege that the note was voluntarily canceled, satisfied, forgiven, and destroyed by said Lillian I. Marget, with the intention of canceling the debt, and that she intended to release the mortgage of record, but failed to do so, by mistake and oversight. Wherefore, the defendants ask that the petition be dismissed, and plaintiff be directed to release the mortgage, and, in default thereof, that the decree itself shall satisfy and release the mortgage. The trial court granted this prayer of the defendants' answer in full.

The facts disclosed by the evidence show that the mother, Lillian I. Marget, left two living sons, Lee and Chester, and the two children of a deceased son, Ward. Lee W. Marget was called by the plaintiff, and testified that his mother kept the note and mortgage in the lockbox in the bank; that all of her papers were kept in that lockbox, and that it was his lockbox. Attorney Waring called his attention to the fact that he had been sworn as a witness in the county court, in the hearing upon this estate, and his evidence had there been taken by a stenographer, and he was asked if he did not testify at that time as follows: "Where was it after you signed it?" and if he did not answer, "We had it in this box." His answer to that question in the district court is that his mother had it in the lockbox that both of them used.

Question: "Was this question asked you in the county court, and did you respond as follows: 'When was the last interest that you paid on the mortgage?' And did you answer, 'I forget the exact date, but it was in 1938?' A. I

don't remember that. * * * Q. Was this question asked you: 'Did you pay all 'the interest due in 1938?' And did you answer, 'Not all of it?' A. I do not recall that."

In the inventory filed July 20, 1939, by Lee W. Marget as administrator of his mother's estate, he shows that all of the real and personal property she left consisted of the west one-half of lot 4, block 2, Linwood addition to the city of Lincoln, of the value of $100.

After he had been appointed administrator of his mother's estate, he said that he made a search for the note and mortgage in the lockbox and he did not find them; that he looked through all of her papers and personal belongings, and did not find the note and mortgage. He testified that he had not paid the note to his mother, or to any one else since her death.

It appears from the evidence that for the last eleven months his mother lived she was taken care of by Mrs. McAvoy, who was a cousin of Lee W. Marget, who testified that after his mother's death Mrs. McAvoy gave him an envelope containing some papers, but he does not recall what was in the envelope. Upon his memory being refreshed, he admitted there was a life insurance policy in the envelope given him by Mrs. McAvoy for $400; that it was made out to him, and that he collected the money, and he admitted that it was understood that this insurance policy was to cover her burial expenses, but that he had filed a claim against his mother's estate in the county court for telegrams, "Thank-you" cards, funeral expenses, and also for his expense and fee as administrator, in the total amount of $297.17, and this was admitted as bearing upon the witness' credibility. It was stipulated that this claim was filed against the estate August 28, 1939, and that he had collected the $400 from the Metropolitan Insurance Company in January, 1939.

Dr. Albert A. Ashby testified for the defendants that he was the physician who took care of Mrs. Marget; that he had conversations with her about Lee's affairs at different times, in his office or wherever she was staying; that he

cannot recall the time of the conversations, except that it was during the last three or four years of her life. He is then asked the question, "You may relate to the best of your ability what Mrs. Marget said about this, about Lee's affairs and hers." The answer was: "Well, Mrs. Marget was worried about her, more or less about her financial condition, ready cash, and of course, she would come in and discuss about the payment of her bill and care and so forth, and she told me if anything went wrong I was to call Lee, that he was supposed to come in and look after it, which he did, and then when she was,—when—one time when she was sick she was worried about financial conditions and she—." The doctor was then interrupted and asked, "Approximately how many years ago do you think it was? A. Three or four years." He then continued his answer: "Why, she said she had everything straightened up, that I didn't need to worry about my bill, that she—that Will had the farm, was to have the farm, and that she had done a great deal for the boy out west and she thought he had had enough cash to make up his share, and that she had some property in Lincoln and that was to go to the—her Lincoln relatives." However, there is no evidence of Dr. Ashby, that the court was able to find, relating directly to the $4,000 note and mortgage.

Francis F. Putlitz testified that he was president of the Farmers State Bank of Fairmont, and acted as a notary for the mortgage in question, which he acknowledged on March 1, 1928. He testified that some time in 1933 or 1934 Lee W. Marget and his mother came into the bank and took out the lockbox with the papers in it, and she told Lee that he did not have to pay the note. His best recollection is that they were in the back room of the bank. He does not have any recollection of the exact language, or anything else that took place. This testimony as to a conversation heard in the back room of the bank between the mother and her son occurred after the note matured in 1933, and the mother may have indicated that her son need not pay the past-due note at that time.

The evidence of Mrs. Olive McAvoy, called by the plain-tiff on rebuttal, brought out the following facts: That she lived in Fairmont, was a cousin of Lee W. Marget, and that Lillian I. Marget was her mother's only sister; that defendant Nellie Marget made arrangements to bring her mother-in-law over, and that she lived there from January 18, 1938, to her death on December 30, 1938, approximately 49 weeks; that the son, Lee, visited her a few times when she first came there; that his visits grew less frequent, and from the last of May until the first of September he never came to see her at all; then in November his mother sent for him to get her glasses fixed, and he saw her a time or two before her death.

Witness said that Lillian I. Marget often talked with her with reference to the money that her son Lee owed her, but he never offered to pay one cent to take care of her all the time she was at Mrs. McAvoy's home. Witness testified that her aunt had papers in a Manila envelope that she kept by her until her death; that one of the things in the envelope was a funeral benefit insurance policy, and another was an insurance policy upon her house, and that there were other papers in this envelope, but she did not know what they were because she never examined them, and she handed this large Manila envelope to Lee W. Marget when he asked for it within an hour after his mother's death.

On cross-examination she admitted that she filed a claim for $96 against the estate, and when asked the question, "You don't have any great amount of love for your cousin Lee?" her answer was, "Not any too much, considering the way he treated his mother, I do not."

Lee W. Marget testified on cross-examination that the $4,000 which he borrowed from his mother was money that she received from her father's estate, and was not money she received from her husband's estate. On direct examination, when asked if he had ever paid this $4,000 note, he answered, "No, sir." He was asked the question, "We want to know why you didn't pay it?" and the answer of the witness was: "One reason I didn't have the money to pay it.

Q. Was there any other reason why you didn't pay it? * * *
A. I wasn't supposed to pay it." And another answer was:
"My mother said that note was to be canceled, I wasn't to
pay it. * * * Q. When did she say that? * * * A. Oh, some
five years ago."

It is rather unusual, but the same counsel appearing in
the case at bar were counsel in the case of *Wilkins v. Skog-
lund,* 127 Neb. 589, 256 N. W. 31, but were contending on
opposite sides of the same proposition, and in that case this
court held: "When the payee voluntarily destroys a promis-
sory note with the intention of canceling the debt, he there-
by discharges the obligation under that provision of the
negotiable instruments act which states, in effect, that a
negotiable instrument may be discharged by intentional
cancelation thereof by the holder, although another provi-
sion of said act declares that the holder may renounce his
rights under the instrument, but that a renunciation must
be in writing."

In *Henley v. Live Stock Nat. Bank,* 127 Neb. 857, 257 N.
W. 244, in discussing the gift of a savings account evidenced
by a bank pass-book, this court held that to make a valid
and effective gift *inter vivos* there must be an intention to
transfer title to the property, as well as a delivery by the
donor and an acceptance by the donee. See, also, *Smith v.
Pacific Mutual Life Ins. Co.,* 130 Neb. 501, 265 N. W. 534;
*Andersen v. Luikart,* 127 Neb. 256, 255 N. W. 18; 12 R. C.
L. 932, sec. 10.

"One of the essential elements of a gift is the intention
to make it. A clear and unmistakable intention on the part
of the donor to make a gift of his property is an essential
element of the gift, and this contention must be inconsistent
with any other theory." *Hild v. Hild,* 135 Neb. 896, 284 N.
W. 730.

There appears to the court to be but one question in this
case: Did Mrs. Marget forgive the $4,000 note and mort-
gage given to her by her son Lee?

It appears from the evidence that the state needed a little
strip of land for highway No. 6 from the 80 acres belonging

to Lee W. Marget and wife, who gave a warranty deed therefor to the state of Nebraska. Exhibit No. 5 is a partial release of the $4,000 mortgage held by the mother, in so far as it affects the 2.441 acres of land deeded by Lee W. Marget to the state of Nebraska for the highway, and the last clause in this partial release, which was made on October 17, 1936, reads as follows: "The said Lillian Marget retains her lien upon the remainder of the premises described in said mortgage to secure the principal sum unpaid, with all interest on the same remaining unpaid, according to the terms and conditions of said mortgage;" same being acknowledged before the deputy county clerk of Fillmore county, and recorded in book 83 of mortgages, page 475.

If, as claimed by the defendants, the mother made the statement in 1933 or 1934, in the back room of the bank, which was overheard by the banker, it is certainly true that in her partial release of the mortgage made in 1936 she declared under oath that the remainder of the land should be held for the payment of the $4,000 mortgage, which proves that she had not at that time forgiven the payment of any part of this mortgage. The evidence clearly indicates that her son Lee did not understand in 1933 or 1934 that his mother had forgiven the entire debt at that time, for he paid her interest on the loan up to 1938, in which year he paid a portion of the interest on the loan, and this voluntary payment of interest by him, coupled with the first answer he made as to why he had not paid the note, that he did not have the money, is very important.

The decision in this case depends upon the sufficiency of the proof that the mother forgave the son the payment of this $4,000. From a very careful reading of the bill of exceptions and an examination of the exhibits in the case, the court has reached the conclusion that the claim of the defendants was not established by clear and convincing testimony, and the holding of the trial court to that effect is hereby

REVERSED.