IN RE ESTATE OF MARY E. SCOTT. MARY E. STRUTHOFF, APPELLANT, v. DR. A. E. COOK, AS THE EXECUTOR OF THE ESTATE OF MARY E. SCOTT, APPELLEE.

26 N. W. 2d 799

Filed April 4, 1947. No. 32137.

*Frederick M. Deutsch* and *C. W. Peasinger,* for appellant.

*Joseph G. Rogers* and *Clarence E. Haley,* for appellee.

Heard before SIMMONS, C. J., PAINE, CARTER, MESS-MORE, YEAGER, CHAPPELL, and WENKE, JJ.

CHAPPELL, J.

Plaintiff brought this action to ascertain and enforce a constructive trust upon the proceeds of a registered $5,000 federal farm mortgage bond in the hands of the executor of the estate of Mary E. Scott, deceased. The bond itself, having come into possession of the executor of the estate, was sold, but as executor he still retained the proceeds therefrom. The questions presented by the pleadings and evidence were whether or not deceased in her lifetime made a gift inter vivos of the bond to plaintiff, and whether or not deceased and her agents, by reason of agreements with and representations to plaintiff upon which she relied, thereafter wrongfully obtained a disclaimer thereto from her. The trial court, after hearing, found and adjudged the issues generally for the defendant and dismissed plaintiff's

petition. Motion for new trial was overruled, and plaintiff appealed to this court, assigning as error substantially, insofar as important here, that the judgment was not sustained by the evidence and was contrary to law. We sustain plaintiff's contentions.

The evidence is without any substantial dispute. Mary E. Scott, a single, aged lady, died testate July 24, 1943. The inventory disclosed that she left an estate consisting of cash in bank, certificates of deposit, government bonds, and the bond involved, totaling $10,673.28, exclusive of interest accumulations. Her will, dated October 13, 1942, which was admitted to probate, after providing for payment of debts and the erection of a monument, gave $100 to each of four churches, $1,500 each to her next of kin and heirs at law, a nephew and four nieces, of whom plaintiff was one, and devised the residue to the United States.

The deceased will hereinafter be designated as the aunt. The other heirs at law had not even seen her for many years. However, during the lifetime of the aunt, plaintiff was her favorite niece and was often referred to as "her girl." They were in a close confidential relationship with each other; they corresponded weekly, and until a few years before the aunt's death, plaintiff frequently visited in her home where the aunt lived with an aged bachelor brother, Frederich Scott, until his death on May 6, 1942. After his death, at the written request of the aunt, plaintiff and her husband, who was an employee of the Internal Revenue Bureau in Los Angeles, California, visited the aunt in September 1942.

During that time the aunt freely expressed an intent to leave her property to plaintiff because plaintiff's father had assisted her financially during his lifetime. She instructed her lawyer to prepare a deed conveying her home to plaintiff, and a deed was so executed and delivered to plaintiff on September 24, 1942, before she left for her home in California. Thereafter, it was duly

recorded and forwarded to plaintiff by the aunt's lawyer. That transaction is not directly involved in this controversy. However, previously, on September 19, 1942, the aunt also informed plaintiff that she had a $5,000 federal farm mortgage bond issued to "Mary E. Scott or Frederich Scott or the survivor," which she desired to give plaintiff. Thereupon, the aunt, with plaintiff and her husband, went to the aunt's bank, where the bond was taken from the aunt's safe deposit box and she instructed the president of the bank to transfer the bond to plaintiff, "her girl," so that she would own the interest and take the place of the aunt's deceased brother, Frederich Scott. Thereupon, such an assignment was duly and properly prepared, signed, sworn to, and executed by the aunt, transferring the bond to "Mary E. Scott or Mary E. Struthoff or The Survivor," and authorizing the transfer thereof on the books of the Federal Farm Mortgage Corporation. The aunt then instructed her banker to send the bond to the proper authorities for that purpose. Pursuant thereto, the bank took possession of the bond and sent it to the Federal Reserve Bank.

In the presence of plaintiff and her husband, the aunt upon the occasion when she signed the deed to the home, also told her lawyer to prepare a will providing for payment of debts, the erection of a monument, the giving of $1,000 each to a nephew and four nieces, of whom plaintiff was one, and giving plaintiff all the residue of her estate. Such a will was duly and properly executed on September 25, 1942, by the aunt, after the lawyer had prepared it as directed by the aunt, and her lawyer, at the aunt's direction, mailed a copy thereof as executed, to the plaintiff. On September 27, 1942, the aunt also wrote to plaintiff, telling her about the execution of the will. It will be remembered that plaintiff was never thereafter informed that the aunt had executed a new will on October 13, 1942, which was also prepared by her lawyer, and plaintiff

had no knowledge thereof until after the aunt's death.

After the bond was sent to the Federal Reserve Bank it required proof of Frederich Scott's death. Delay was thus encountered, and the aunt, for reasons of her own not apparent here, changed her mind as indicated by her affidavit executed October 19, 1942, which was sent to the Federal Reserve Bank, requesting cancellation of the assignment made by her to plaintiff on September 19, 1942, and transfer of the bond to the aunt individually, falsely averring therein that plaintiff had no knowledge of such assignment, and averring that it was without consideration. In the meantime, the president of the aunt's bank, in her behalf twice wrote plaintiff's husband requesting that plaintiff execute disclaimer of her interest in the bond, which plaintiff refused to do. However, on November 28, 1942, the aunt's banker again wrote plaintiff's husband, urging execution of an enclosed disclaimer by plaintiff, representing that "as we understand from Miss Scott's Atty. these funds go to your wife after her death" in any event.

Pursuant thereto, and relying thereon, with knowledge of the provisions of the will of September 25, 1942 then in her possession, but without knowledge or notice of the aunt's subsequent will of October 13, 1942, and without any consideration whatever, plaintiff on December 2, 1942, executed the enclosed disclaimer. Likewise, for reasons not entirely clear and unimportant here, plaintiff thereafter under similar circumstances, executed three other disclaimers. Suffice it is to say that in reply to request on December 16, 1942, for one of them by the aunt's banker, plaintiff's husband wrote: "Sorry to have given you so much trouble. This was Miss Scott's idea in order to save probate costs and a good one." The implications thereof are clear to us. The bond had been given to plaintiff, which naturally took it out of the aunt's estate, but since, as represented to and believed by plaintiff, the aunt's will gave it to plaintiff in any event, she executed the disclaimers.

Under the circumstances, was there a gift inter vivos? We conclude that there was. The aunt was concededly competent and intended to make such a gift. Her words and acts affirmatively so established her intent. They are not consistent with any other theory. Certainly there was not only donative intent but also a delivery of the bond and acceptance thereof by plaintiff, which are the essential requirements of a gift inter vivos. 38 C. J. S., Gifts, § 10, p. 786. The fact that a disclaimer by plaintiff was considered by all as imperative attests its irrevocable character. Everything was done that could have been done to perfect a gift inter vivos. What more could be required when the aunt also retained an interest in the bond until her death, when all of it would pass to the plaintiff as survivor?

It is generally true that delivery is essential to constitute a gift inter vivos. Ordinarily actual delivery is necessary where the subject of the gift is capable of manual delivery, but where actual manual delivery cannot be made, the donor may do that which, under the circumstances, will in reason be considered equivalent to actual delivery. In such cases the delivery may be symbolical or constructive if as nearly perfect and complete as the nature of the property and the attendant circumstances will permit. Annotation, 145 A. L. R. 1386. See, also, 24 Am. Jur., Gifts, § 27, p. 744.

Stated in another way, once it is ascertained that it was the intention of the donor to make a gift inter vivos of an undivided interest in a chattel or chose in action, and all is done under the circumstances which is possible in the matter of delivery, as in the case at bar, the gift will be sustained. Annotation, 145 A. L. R. 1386; Smith v. Pacific Mutual Life Insurance Co., 130 Neb. 501, 265 N. W. 534; Dinslage v. Stratman, 105 Neb. 274, 180 N. W. 81, 14 A. L. R. 702.

In that regard, also, there was nothing inconsistent with retention of possession of the bond by the aunt or

her banker, since it was not incumbent upon the aunt to surrender it, inasmuch as she continued to own an interest analogous to a joint tenancy with right of survivorship in the bond, and her possession was not solely in her own right but partly as agent or trustee for plaintiff, who by the gift was vested with the same interest. Abegg v. Hirst, 144 Iowa 196, 122 N. W. 838, 138 Am. S. R. 285; Collins v. McCanless, 179 Tenn. 656, 169 S. W. 2d 850, 145 A. L. R. 1380; Beach v. Holland, 172 Ore. 396, 142 Pac. 2d 990, 149 A. L. R. 866; In re Estate of Dayton, 121 Neb. 402, 237 N. W. 303; 28 C. J., Gifts, § 22, p. 633, § 26, p. 637; 38 C. J. S., Gifts, § 18, p. 794, § 19, p. 797, § 22, p. 801.

Having concluded that there was a gift inter vivos, we turn to the question whether, under the circumstances, there was a constructive trust enforceable in equity. In Box v. Box, 146 Neb. 826, 21 N. W. 2d 868, this court held that: "A constructive trust is a relationship with respect to property subjecting the person by whom the title to the property is held to an equitable duty to convey it to another on the ground that his acquisition or retention of the property is wrongful and that he would be unjustly enriched if he were permitted to retain the property.

"If a party obtains the legal title to property by virtue of a confidential relation, under such circumstances that he ought not, according to the rules of equity and good conscience as administered in chancery, hold and enjoy the benefits, out of such circumstances or relations, a court of equity will raise a trust by construction and fasten it upon the conscience of the offending party and convert him into a trustee of the legal title."

As early as Pollard v. McKenney, 69 Neb. 742, 96 N. W. 679, affirmed on rehearing at page 753, 101 N. W. 9, this court said: "Closely allied to resulting trusts, and frequently confused with them, are constructive trusts. This class of trusts arises from actual or constructive fraud or imposition, committed by one party

on another. 1 Perry, Trusts (5th ed.), sec. 166. Thus if one person procures the legal title to property from another by fraud or misrepresentation, or by an abuse of some influential or confidential relation which he holds toward the owner of the legal title, obtains such title from him upon more advantageous terms than he could otherwise have obtained it, the law constructs a trust in favor of the party upon whom the fraud or imposition has been practiced. Again, if a party obtains the legal title to property by virtue of a confidential relation, under such circumstances that he ought not, according to the rules of equity and good conscience as administered in chancery, hold and enjoy the benefits; out of such circumstances or relations, a court of equity will raise a trust by construction and fasten it upon the conscience of the offending party and convert him into a trustee of the legal title. Thompson v. Thompson, 16 Wis. 94; McClain v. Johnson, 43 Vt. 48; Hollinshead v. Simms, 51 Cal. 158." See, also, O'Shea v. O'Shea, 143 Neb. 843, 11 N. W. 2d 540; 65 C. J., Trusts, § 215, p. 454, § 226, p. 476.

This court reaffirmed and approved the above statement of the law and explained the occasion and manner of its application in Box v. Box, *supra*. In that opinion this court also approved the statement appearing in 54 Am. Jur., Trusts, § 225, p. 173, to the effect that: "While a confidential or fiduciary relationship does not in itself give rise to a constructive trust, an abuse of confidence rendering the acquisition or retention of property by one person unconscionable against another suffices generally to ground equitable relief in the form of the declaration and enforcement of a constructive trust, and the courts are careful not to limit the rule or the scope of its application by a narrow definition of fiduciary or confidential relationships protected by it. An abuse of confidence within the rule may be an abuse of either a technical fiduciary relationship or of an informal relationship where one person trusts in and relies upon

another, whether the relation is a moral, social, domestic, or merely personal one. The origin of the confidence reposed is immaterial. A confidential relationship within the rule need involve neither a promise for the benefit of another nor an express fiduciary relationship."

Referring to a constructive trust arising out of an oral promise to hold property in trust, or for a specified purpose, or to reconvey, the opinion also approved a statement appearing in 65 C. J., Trusts, § 223, p. 471, which recites that: "Such a trust will arise, however, out of such a promise made in connection with the receipt of the legal title to property, provided the grantor's purpose is an honest one, * * * where confidential relations exist between the parties and there is no other consideration for the conveyance except the promise, or where the promise is the inducing cause of the conveyance, no other consideration being given, and is relied upon by the grantor, or where the conveyance is made as security for a debt and the value of the land exceeds the amount of the debt. The promise need not be express in order to raise a trust, silent acquiescence on the part of the grantee being sufficient where he has knowledge of the grantor's intention and understanding of the transaction." See, also, Wiseman v. Guernsey, 107 Neb. 647, 187 N. W. 55.

In the case at bar, after the gift inter vivos was complete, plaintiff was led to believe, by the agreements and representations of the aunt and her agents, that the property had been willed to plaintiff in any event, at the same time concealing from her the fact that on October 13, 1942, the will of September 25, 1942, so disposing of it had been superseded by one giving it to others. They thereby obtained disclaimer from plaintiff of her interest in the bond without any consideration whatever, and the aunt accepted and retained the benefits therefrom during her lifetime.

Under such circumstances, a constructive trust will be and is imposed by equity in order to restore to

plaintiff the property of which she was thus deprived, the retention of which by the estate would result in an unjust enrichment.

For the reasons heretofore stated, the judgment of the trial court is hereby reversed with instructions to enter a judgment for plaintiff in conformity with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.

YEAGER, J., dissenting.

I respectfully dissent from the majority opinion in this case. Since I do not agree with the conclusions and deductions which the majority have drawn from the record it becomes necessary to set forth testimony and deductions therefrom at considerable length.

Mary E. Scott, a spinster of the age of 87 years, died testate, July 24, 1943. On May 6, 1942, an unmarried brother, Frederich Scott, died testate. Prior to his death for many years this brother and sister had lived together. At the time of the death of Frederich this brother and sister were joint owners with right of survivorship of a Federal Farm Mortgage Corporation bond of the face value of $5,000. Up to the time of the incidents involved in this action Mary E. Scott had taken no steps to acquaint the Federal Farm Mortgage Corporation, the obligor of the bond, with the fact that Frederich had died and that as survivor she was the sole obligee.

In September 1942, the plaintiff and her husband, John H. Struthoff, came from their home in Glendale, California, to visit Mary E. Scott. Plaintiff was a niece. They remained and visited in the home of Mary for about nine days. During that time a deed was executed wherein Mary conveyed her home to plaintiff. During this visit Mary E. Scott, the plaintiff, and John H. Struthoff went to the bank where the bond was kept and Mary got the bond, took it to the desk of the president of the bank, and there a transfer was executed by the terms of which the bond was assigned

to Mary E. Scott or Mary E. Struthoff or the survivor. The assignment is as follows: "For value received the undersigned hereby assigns to Mary E. Scott or Mary E. Struthoff or The Survivor the within Federal Farm Mortgage Corporation registered bond and authorizes the transfer thereof on the books of the Federal Farm Mortgage Corporation. Mary E. Scott (Signature of Assignor) Personally appeared before me the above named assignor, known or proved to me to be the owner of the within bond or his duly authorized representative, and signed the above transfer, acknowledging it to be his free act and deed. Witness my hand, official designation and seal. F. S. Stegge (Signature of attesting officer) President, First State Bank, Randolph, Nebr. (Official designation) Dated at Randolph, Nebr. September 19th. 1942 (Seal)." Soon thereafter plaintiff and her husband returned to their home in California.

The bond with the endorsed assignment was sent by the president of the bank to the obligor corporation for transfer on its books and for cancellation and the issuance of a new bond to the assignees. On receipt of the bond the obligor corporation exacted proof of the death of Frederich. This proof was furnished in the form of affidavits by Joseph G. Rogers and Ralph Bacon. The affidavits bear the date of October 2, 1942. However, no bond was issued to the assignees.

On October 19, 1942, Mary executed a new assignment of the bond to herself alone. On the same day she made affidavit that the previous assignment was made without the knowledge or consideration of plaintiff and with the erroneous understanding that she, Mary E. Scott, could dispose of the bond prior to maturity without assignment by plaintiff, which she had learned was not the case under the regulations of the obligor. In the affidavit she asked that the assignment of September 19, 1942, be canceled and that the bond be

transferred to her individually in accordance with the assignment of October 19, 1942.

Apparently on receipt of this affidavit and the second assignment the obligor, or its agent, which appears to have been the Federal Reserve Bank of Kansas City, Missouri, requested a disclaimer from plaintiff of any rights under the first assignment as a condition of transfer under the second.

Request or requests for disclaimer were made by Frank S. Stegge, the president of the bank where the bond was kept prior to the assignments. Four separate disclaimers were executed by plaintiff and forwarded to Stegge. The first was executed December 2, 1942. We do not know the date of execution of the second and third but they were mailed by Stegge to plaintiff respectively on December 16, 1942, and January 1, 1943. The fourth was executed February 16, 1943. The first and the last are in evidence and are as follows:

"The undersigned Mary E. Struthoff, hereby disclaims any title or interest in a bond described as a 3% registered Federal Farm Mortgage Corporation Bond of 1944-49, in the sum of $5,000.00, numbered 311A, which bond was assigned to Mary E. Scott or Mary E. Struthoff or the survivor. Dated this 2d of Dec., 1942. (Signed) Mary E. Struthoff Witness: (Signed) Robt. M. Pratt Signature Guaranteed Glendale Branch Security-First National Bank of Los Angeles By D. H. Smith Vice-President Authorized Signature (Seal)"

"DISCLAIMER OF INTEREST I, Mary E. Struthoff, the second named assignee in the first assignment on the following described bond:

| Loan | Denom. | Serial No. | Inscription |
|------|--------|-----------|-------------|
| 3 percent Federal Farm Mortgage Corporation bond of 1944-49 | $5,000 | 311-A | Mary E. Scott or Frederich Scott or the Survivor |

do hereby affirm that the assignment to me thereon

has not been completed by delivery, and I do hereby disclaim any and all interest in and to the said bond. Mary E. Struthoff (Signature) Personally appeared before me, Mary E. Struthoff, and signed the above disclaimer of interest, acknowledging the same to be her free act and deed. Witness my hand and official designation. Roland Bush (Signature) Assistant Branch Manager GLENDALE BRANCH Security-First National Bank of Los Angeles (Official designation) Dated at Glendale Calif. Date Feb. 16 1943 (Seal)."

Finally a transfer was made and a new bond to and in the name of Mary E. Scott was issued. After her death the bond was converted to cash by the executor and he now holds the fund as a part of the assets of the estate.

It is upon this fund that the plaintiff seeks to have a trust impressed in her favor. She seeks to have the trust impressed on the theory that by the assignment and the incidents surrounding it a valid and binding gift inter vivos of a joint interest in the bond came to her from Mary E. Scott and that by the death of Mary E. Scott she became the sole owner thereof.

Plaintiff contends that she was induced to sign the disclaimer of interest in the bond by a representation of Mary E. Scott made through an agent that the bond would come to her by will.

In order to make a valid gift inter vivos, there must be an intention to transfer title to the property, and a delivery by the donor and acceptance by the donee, and the transfer must be so complete that if the donor again resumes control over it without the consent of the donee he becomes liable as a trespasser. Ladman v: Farmers & Merchants Bank, 130 Neb. 460, 265 N. W. 252; Smith v. Pacific Mutual Life Ins. Co., 130 Neb. 501, 265 N. W. 534; First Trust Co. v. Hammond, 140 Neb. 330, 299 N. W. 496.

In this case it becomes necessary to determine what Mary E. Scott intended when she executed the assign-

ment to the plaintiff.   Hild v. Hild, 135 Neb. 896, 284 N. W. 730.

In ascertaining whether or not a gift inter vivos was intended it is necessary to consider all facts and circumstances surrounding the transactions including subsequent declarations of the donor.   Jones v. Ewart, 143 Neb. 717, 10 N. W. 2d 708; In re Estate of Vanicek, 145 Neb. 531, 17 N. W. 2d 477.

Pertinent facts and proper inferences from disclosed facts are that Mary E. Scott was mindful of her advanced years and of impaired health; that she had in mind the preservation of her estate and the safeguarding of her own well-being for her remaining span and the disposition of the estate on her death.   The estate consisted of a home, and other assets amounting to almost $10,000. She had never been married and had no surviving brothers or sisters.   She had a nephew and four nieces including plaintiff.   Plaintiff was the favored of the five. There can hardly be any question that at the time the first assignment was executed that Mary E. Scott intended that plaintiff should succeed her in the ownership of the bond.   It is not however certain that she intended this succession to take place prior to her decease.

The following evidence bearing on the question of intent appears in the testimony of plaintiff's husband: "Q  Will you detail the facts and circumstances about that.   A  Well, we were in the kitchen in the morning. Aunt Mary and my wife were washing dishes, I was sitting in a chair at the table when she said, my girl, I have a bond, which would you rather have, the bond or the home.   My wife said the bond would be better for her to have under the circumstances since we were so far away, so she says all right, we will take care of it right away, so we went to the bank about ten in the morning.   Mr. Stegge and Aunt Mary got the bond out of the vault and Aunt Mary took it over to Mr. Stegge's desk and signed the endorsement on the back of the

bond in the presence of Mr. Stegge. * * * Q I misunderstood you, I thought it was between the time you saw Mr. Rogers and the time the deed was signed, but you think it was before that? A It may have been, I am not positive about that. Later she made the remark, I am going to give you both of them. Q Now at the time that this deed, Exhibit 2, was executed by your aunt, what, if any instructions did she give to Mr. Rogers in reference to her property? A Well, after the deed was signed she picked it up rather suddenly and said, talking to Mr. Rogers, I want all of my estate to go to my girl here and fix the other details, and Mr. Rogers replied, then we will have to make a new will. Then they went on to the details of making a new will. * * * Q What did Mary E. Scott direct Mr. Stegge to do, if anything, with reference to this bond at that time? A She explained to Mr. Stegge that she wanted her brother's interest in the bond assigned to Mrs. Struthoff, and arranged with him to go get the bond out of the vault and it was taken over to Mr. Stegge's desk and Miss Scott endorsed it on the back. Q Did she say anything as to who was to get the bond in the event of the death of the other? A She said she wanted the bond to go to her girl, Mary Struthoff. Q If she died first? A Yes. * * * Q Did she tell Mr. Stegge to send the bond down there so the names would be changed to the two of them? A She wanted Mr. Stegge to attend to the bond whatever was necessary to make the transfer proper. Q And transfer the interest to your wife? A That's right." On cross-examination: "Q What was said about—what did Miss Scott say about transferring the bond, just what did she tell Mr. Stegge? A She wanted my wife's name placed on the bond instead of her brother Fred's, who had passed away, so that she could enjoy the bond if she passed away. Q Did she say she wanted the bond made in such way that she would have control of the bond during her lifetime? A Not at that time. Q What sort of assignment did she ask Mr.

Stegge for, Mr. Struthoff, can you tell me that? A Well, she wouldn't have the ability to suggest about any kind of assignment or those things, but she wanted my wife's name placed in Fred's name on that bond—to take the same place he had while he was living."

The following appears in the testimony of Frank S. Stegge: "Q And pursuant to your talk with Miss Scott, you prepared this assignment on the back of the bond, is that right? A Yes, sir. Q And signed as a witness and as managing officer of the bank? A Yes, sir. Q After that was done, Miss Scott told you to send that in to the Federal Reserve Bank to secure the new bond payable to the two of them, is that right? A Yes, sir." Further in the testimony of this witness and relating to the time when Mary E. Scott desired issuance of the bond in her name alone appears the following: "Q And because of the trouble she was having, she began talking there and wanted the bond back in her name? A That was my opinion. Q She told you that? A No, she didn't give any reason why. Q At any rate she wanted it back in her name and told you to get it back in her name? A Yes, sir." The following appears in the testimony of Joseph G. Rogers, attorney for the deceased, on cross-examination: "Q When was it Miss Scott first told you that she didn't think she was assigning this bond and wanted it back in her name? A I would say it was about the 9th or 10th of October, 1942."

In the bill of exceptions appears a letter, Exhibit 10-A, dated December 16, 1942, dealing with the effort to obtain a sufficient disclaimer from plaintiff. It is from F. S. Stegge and is addressed to the husband of plaintiff. The letter was returned to Stegge with the following note which I think of significance as to the intent of Mary E. Scott when she made the assignment. "Sorry to have given you so much trouble. This was Miss Scott's idea in order to save probate costs and a good one. Wish you had known it required more than the her original signature. Struthoff"

This is substantially all of the evidence contained in the record bearing on the intent of Mary E. Scott in the making of the assignment. It will be observed that in none of it is there testimony or documentary evidence directly declaring that intent. It becomes necessary therefore to resort to inferences from the facts and circumstances disclosed by the record to determine this question.

In favor of the plaintiff is the circumstance that the assignment was absolute and definite in its terms. Also in her favor is the circumstance that directions were given to have the assignment made effective. Further the undisputed evidence that she intended favorable treatment of plaintiff in the disposition of the estate must be considered.

On the other side first and foremost consideration must be given to the fact that there is no statement of intention to transfer either title or possession immediately or to surrender control. Control was never surrendered. It is true that she said she wanted to place plaintiff in the situation of her deceased brother, the former joint owner, but there is a reasonable inference that she wanted full control during her lifetime. As soon as she found that the effect of the assignment was to interfere in that respect she set about to get rid of the interference. The size of the estate supports an inference that she did not intend to put the bond so far beyond her reach that its proceeds would not be available in case of need for support and maintenance. This has force in the light of the fact which is apparent from the record that there was no place for her to look for support except to this bond and the other assets of her estate. She declared that she wanted plaintiff to have her estate but never stated that she wanted her to have it before her own death. After the assignment was made she declared in substance that she wanted control in her lifetime. It is true that she did not declare that this had been her prior intention but for

reasons already given this appears highly probable.

Of significance also is the note of the husband of the plaintiff appearing on Exhibit 10-A. Plaintiff's case depends for the most part on the intent of Mary E. Scott as expressed in the testimony of this witness. This note has, without doubt, reference to the intent in the making of the assignment and expresses the understanding of the witness of her motive and purpose, if not the full intent. The purpose was to save probate costs. He said: "This was Miss Scott's idea in order to save probate costs and a good one." This is not to say that such a motive is a bar to a contention that she intended immediate transfer.

Then again it appears to me that the attitude of plaintiff on being apprised of the desire of Mary E. Scott to have the bond issued in her name and on being asked for disclaimer of interest in the bond is of significance. She never demurred but in due course and without protest executed four disclaimers in order to effect this purpose. I think it not unreasonably inferable from this that she understood from the beginning that Mary E. Scott intended to retain control of the bond during her lifetime. This is not conclusive of course but it requires consideration along with all the other facts and circumstances as disclosed by the record.

Plaintiff contends that she executed the disclaimers on the belief, induced by a letter of the witness Stegge, that she would receive the bond by will of Mary E. Scott. She offered evidence, which was rejected, that it was on advice of her husband in this connection that she signed the disclaimers. This being an action in equity with trial de novo I will consider the evidence as having been admitted. There is no allegation of fraud in the petition and no effort has been made to vacate or set aside the disclaimer on that or any other ground. There is a suggestion of fraud in the brief of appellant but I find no evidence of fraud or overreaching of any party to the action.

It is true that Stegge did on November 28, 1942, write a letter to the husband of the plaintiff in which was contained the following statement: "* * * as we understand from Miss Scott*t*'s Atty. these funds go to your wife after her death, it is only that she wants controll of funds during her life time, personally I dont thing she will ever need to sell the bond, so if your wife will sign the disclaimer we will try and get this matter cleaned up." It is further true that on October 13, 1942, Mary E. Scott executed a will, the effect of which was to deprive plaintiff of any interest in the bond or the estate except to the extent of $1,500.

Whatever may have been the fact with regard to the contents of the will there is no evidence that the statement of Stegge was made with knowledge or consent of Mary E. Scott or even that Stegge had knowledge of the contents of the will and made his statement with reference thereto. Plaintiff before executing the disclaimers never sought information from anyone in a position to authoritatively or accurately inform her in this respect.

However this be, whatever reliance, if any, plaintiff placed upon the letter of Stegge cannot be considered as having weight in proof or disproof of the intent of Mary E. Scott when she executed the assignment. Neither may it be considered of value for any other purpose since the legal effect of the disclaimer which was acted upon by the obligor of the bond is not presented by the record. The plaintiff presented her case on the theory of gift inter vivos alone and the defendant has not resisted her right of recovery on the ground that assuming proof of a gift she may not recover since she disclaimed and thereby surrendered the gift.

In order to sustain a right of recovery the burden was on plaintiff, she having taken the affirmative on the issue, to prove that there was a gift of the bond. Krull v. Arman, 110 Neb. 70, 192 N. W. 961.

After a review of the evidence I have arrived at

the conclusion that plaintiff has failed to sustain the burden. Moreover I am convinced that the evidence preponderantly indicates that Mary E. Scott did not intend a transfer of title to the bond and a complete delivery such as would subject her to an action in trespass if she resumed control without the consent of the plaintiff.

I am of the opinion that at most it was her intention to place plaintiff in such a position as to permit plaintiff to succeed to title and possession of the bond on her death with the right to use the bond for her own purposes if the need arose in her lifetime. This conclusion effectually disposes of all the assignments of error contained in the brief.

Accordingly, as I believe, the decree of the district court should be affirmed.