HENRY KEHL, APPELLEE, V. OMAHA NATIONAL BANK, APPELLEE: FIRST NATIONAL BANK OF OMAHA, ADMINISTRATOR, INTERVENER, APPELLANT.

FILED APRIL 13, 1934.  No. 28868.

*O. B. Clark* and *Finlayson, Burke & McKie*, for appellant.

*King & Haggart* and *Wells, Martin, Lane & Offutt*, contra.

Heard before GOOD, EBERLY and DAY, JJ., and CARTER and CHAPPELL, District Judges.

CARTER, District Judge.

This suit was brought by Henry Kehl, husband of Christine Kehl, deceased, to recover from the Omaha National Bank the amount of a savings account standing in the name of Mr. and Mrs. Henry Kehl. The account was originally opened in 1920, and stood in the name of Mrs. C. Kehl until April 6, 1929, at which time the records of the bank were changed to a joint account. Henry Kehl's name was at this time added to the pass-book, the ledger account of the savings' department and the card in the central filing system. On August 5, 1930, a new pass-book was issued to Mr. and Mrs. C. Kehl. From April 6, 1929, until the date of her death, Mrs. Kehl made regular deposits in the account, using the pass-books on which her husband's name appeared. Mrs. Kehl died April 24, 1932. The signature card covering the account was not dated. Stamped on the face of the card with a rubber stamp was the following joint tenancy agreement: "It is agreed that the persons whose names are

signed hereon are the owners of the moneys deposited in this account as joint tenants with the right of survivorship and not as tenants in common, and the bank is authorized to pay out said moneys on the order of either during the lifetime of both, and after the death of either, said money shall be the property of and payable to the order of the survivor." The First National Bank of Omaha, administrator of the estate of Christine Kehl, deceased, was impleaded and assumed the defense. The Omaha National Bank admitted possession of the account in the sum of $6,860.86, and was interested in the litigation as a stake-holder only. John Lemly, a son of Christine Kehl by a former marriage, claims, through the First National Bank of Omaha, the administrator of Mrs. Kehl's estate, an interest as an heir in the account, alleging that the joint tenancy agreement shown on the records of the bank was unauthorized by Mrs. Kehl and, even if authorized, that she was incompetent at the time to enter into such an agreement. The trial court sustained plaintiff's motion for a directed verdict and, from an order overruling intervener's motion for a new trial, the intervener brings this appeal.

It is the contention of plaintiff that both parties moved for a directed verdict and that the sustaining of plaintiff's motion was equivalent to a verdict by a jury on the findings of fact. The record discloses, however, that plaintiff's motion for a directed verdict was made and sustained by the court before intervener moved to dismiss plaintiff's petition. Why intervener moved to dismiss after plaintiff's motion was sustained, we are unable to say. We fail to see, however, how it could in any way affect the proceedings held previous to the time it was made. The judgment entered recites: "The intervener thereupon moves the court to dismiss plaintiff's petition, and the plaintiff moves for dismissal of the petition of intervention and for findings and judgment thereon in his favor by the court." The judgment entered is in direct conflict with the proceedings shown in the bill of

exceptions. Under these circumstances the record shown by the bill of exceptions must prevail. This court has held: "A bill of exceptions duly allowed and certified by the trial judge imports absolute verity and its truthfulness cannot be assailed collaterally." *Gregory v. Kaar*, 36 Neb. 533. In the case of *Schlachter v. St. Bernard's Roman Catholic Church*, 20 S. Dak. 186, it was held: "While the recitals in a judgment are presumptively true, an affirmative showing in the bill of exceptions that they are not true must prevail over the presumption." We must therefore consider the case on the basis of a directed verdict for the plaintiff in which the intervener did not join.

Complaint is made that the records of the bank were not sufficiently identified to permit their introduction in evidence. The evidence discloses that the records of the bank were kept by numerous clerks and officials. At the time the joint tenancy agreement was placed of record in the bank, it appears that one Erickson handled the transaction for the bank and made the entries on the records. The record shows that Erickson died four or five days before the trial in the lower court was commenced. With Mrs. Kehl dead and Henry Kehl barred from testifying by statute, the question arises whether the evidence given by one McAllister, the auditor in charge of the books of the Omaha National Bank, was proper. Mr. McAllister identified the handwriting of Erickson, testified that he was familiar with the method of keeping the records before and after the date of the agreement in question, and stated that the entries pertaining to the transaction were made in the usual course of business. The Omaha National Bank is a mere stakeholder in the litigation and has no interest in the fund except as such. The trial court admitted the records in evidence over objection and the intervener alleges that this constitutes prejudicial error. The reasons justifying the admission of this class of evidence have not been touched upon to any great extent by this court. The reasons for its admission in evi-

dence are well set forth in 3 Wigmore, Evidence (2d ed.) sec. 1522, and we quote freely from this work:

"The situation is one where, even though a desire to state falsely may casually have subsisted, more powerful motives to accuracy overpower and supplant it. In the typical case of entries made systematically and habitually for the recording of a course of business dealings, experience of human nature indicates three distinct though related motives which operate to secure in the long run a sufficient degree of probable trustworthiness and make the statements fairly trustworthy: (1) The habit and system of making such a record with regularity calls for accuracy through the interest and purpose of the entrant; and the influence of habit may be relied on, by very inertia, to prevent casual inaccuracies and to counteract the possible temptation to misstatements. * * * (2) Since the entries record a regular course of business transactions, an error or misstatement is almost certain to be detected and the result disputed by those dealing with the entrant; misstatements cannot safely be made, if at all, except by a systematic and comprehensive plan of falsification. As a rule, this fact (if no motive of honesty obtained) would deter all but the most daring and unscrupulous from attempting the task; the ordinary man may be assumed to decline to undertake it. In the long run this operates with fair effect to secure accuracy. (3) If, in addition to this, the entrant makes the record under a duty to an employer or other superior, there is the additional risk of censure and disgrace from the superior, in case of inaccuracies,—a motive on the whole the most powerful and most palpable of the three."

Naturally, in the case at bar, if Mr. Erickson had been available, he could furnish the best evidence as to the transaction. But since his testimony is not available because of his death, logic and sound reason demand that justice should not fail because of conditions over which the parties have no control. In the case of *Nicholls v. Webb*, 8 Wheat. (U. S.) 326, Justice Story says: "If he

had been alive at the trial, there is no question that the protest could not have been given in evidence, except with his deposition, or personal examination, to support it. His death gives rise to the question, whether it is not, connected with other evidence, and particularly with that of his daughter, admissible secondary evidence for the purpose of conducing to prove due demand and notice. * * * The general objection to evidence, of the character of that now before the court, is, that it is in the nature of hearsay, and that the party is deprived of the benefit of cross-examination. That principle also applies to the case of foreign protests. But the answer is, that it is the best evidence the nature of the case admits of. If the party is dead, we cannot have his personal examination on oath; and the question then arises, whether there shall be a total failure of justice, or secondary evidence shall be admitted to prove facts, where ordinary prudence cannot guard us against the effects of human mortality? Vast sums of money depend upon the evidence of notaries and messengers of banks; and if their memorandums, in the ordinary discharge of their duty and employment, are not admissible in evidence after their death, the mischiefs must be very extensive. * * * We think it a safe principle, that memorandums made by a person in the ordinary course of his business, of acts or matters which his duty in such business requires him to do for others, in case of his death, are admissible evidence of the acts and matters so done. It is of course liable to be impugned by other evidence; and to be encountered by any presumptions or facts which diminish its credibility or certainty." In the case of *Schmidt v. Scanlan,* 144 N. W. 128 (32 S. Dak. 608) it was held: "A bank cashier, who had knowledge of the methods of bookkeeping, etc., of bank employees before he was cashier, and was familiar with the records of the bank, could testify as to the custom of previous employees in entering bank transactions in the books, and to the import of such entries." We are,

therefore, of the opinion that the evidence complained of was properly admitted by the trial court.

Section 8-164, Comp. St. 1929, provides: "When a deposit in any bank in this state is made in the name of two or more persons, deliverable or payable to either or to their survivor or survivors, such deposit or any part thereof, or increase thereof, may be delivered or paid to either of said persons or to the survivor or survivors in due course of business." In construing this statute and holding, under facts similar to the case at bar, that a donative intent was presumed, this court, in the case of *In re Estate of Johnson*, 116 Neb. 686, said: "We think that, when Johnson made the deposit payable to himself or to his wife, he must have known, and so he presumed, that the bank would pay the obligation to either himself or to his wife, and to no other person. We must assume that he knew of the statute, and that the bank would follow its provisions. We think the legislature must also have had that exact thought in mind when it enacted the law. We, therefore, hold that the legal title to the funds is fixed in the persons named in the certificates, and that the survivor, if one dies, takes the whole legal title." We, therefore, hold that the joint tenancy agreement herein set out operates as a gift from Mrs. Kehl to her husband, even though the actual enjoyment thereof by the husband was postponed until the death of Mrs. Kehl. "Section 8046, Comp. St. 1922, relating to the payment by a bank of deposits entered as payable to any one of two or more persons named therein, not only is intended for the protection of the bank, but also fixed the property right of the persons named, unless the contrary appears from the terms of the deposit." *In re Estate of Johnson*, 116 Neb. 686.

There being undisputed evidence establishing the joint tenancy agreement, and the rights of the parties having been fixed by statute, the trial court properly overruled intervener's motion to dismiss the action, made at the

close of plaintiff's evidence, for the reason that the evidence was insufficient to sustain a judgment.

The intervener next contends that, even if the making of the joint tenancy agreement is established, it cannot be upheld for the reason that Mrs. Kehl was mentally incompetent at the time it was made. The general rule is that the incompetency of a person to contract in a particular case is a question of fact to be decided by a jury, but that the legal effect of incompetency, admitted or proved, is a question of law. There can be no dispute that, in a civil case, it is for the court to decide whether sufficient evidence appears to justify the submission of the issue of incompetency to the jury; yet, if the evidence is conflicting or of such a character that different inferences might reasonably be drawn therefrom, it should be submitted to the jury.

In the case at bar, the plaintiff produced no evidence of the competency of the deceased on April 6, 1929, the date the joint tenancy agreement was made. The deceased is presumed to have been competent and the question for our consideration is whether the evidence of intervener is sufficient to require the consideration of the jury.

Intervener called several witnesses who testified that they had known Mrs. Kehl for long periods of time immediately before her death. The evidence generally was that deceased had suffered from diabetes and other ailments; that she had suffered at least two accidents by falling, once injuring her head and the other time breaking her hip; that her memory was not good and that she continually switched from one subject to another; that her tongue was thick and she could not talk very good; that she could not eat well and easily choked; that she was unable to reason and became very slovenly in her dress and appearance; that some of the witnesses wrote letters for her because of her bad eyesight; that she grew worse in 1929 and 1930; that she was absent-minded and got lost easily; that it was hard for her to get around;

that she was losing weight and her speech became disconnected; that she confused and forgot the names of her grandchildren that she well knew; and that she became confused and lost in her usual surroundings. While we have made no effort to detail the evidence of each witness, this is the general purport of the testimony.

Intervener complains of the trial court's rulings refusing to permit nonexpert witnesses to give their opinions as to the mental competency of the deceased. The rule in this state is: "If the mental condition of a litigant becomes a material subject of inquiry, it is competent to receive the opinion of a nonexpert witness, concerning that condition, where it appears that the witness has for years been intimately acquainted with the litigant, and the opinion is formed upon facts within the personal knowledge of the witness and sworn to by him before the jury." *Hilmer v. Western Travelers Accident Ass'n*, 86 Neb. 285. In *Clarke v. Irwin*, 63 Neb. 539, in reversing the trial court for excluding like evidence of a nonexpert witness, this court said: "It seems to be a well-settled rule that nonexpert witnesses who show a personal acquaintance with the person alleged to be insane, extending over a considerable period of time, and are shown to have a sufficient acquaintance to be able to form an opinion, after detailing to the jury the facts and circumstances upon which such opinion is based, are permitted to testify whether in their opinion such person is sane or insane. The established doctrine is that if the witness has sufficient opportunity for observation to enable him to form an opinion upon the question of the sanity of the person, then he is a competent witness, and may be permitted to testify to such opinion. This rule seems based upon sound reason. In fact, if the rule were otherwise, grievous hardship and injustice might frequently result. Cases might, and frequently do, arise in which medical experts differ as to whether the person in question is sane or otherwise. In such cases, in the absence of a rule permitting nonexpert witnesses to testify, the jury might not

be able correctly to determine whether the person was or was not insane. The qualification of the witness to give his opinion of the sanity of a person is a question resting very largely in the sound discretion of the trial court. There is no doubt that, had the witness McFarron given in detail all the facts and circumstances of his acquaintance with Irwin, the different times he had seen him, how he looked, talked and acted, and how he did business, his testimony would have had more probative force, and would have been of more value to the jury than as offered. But this objection goes rather to the weight than to the competency of the evidence. The weight to be given testimony is exclusively for the jury, taking into consideration the credibility and intelligence of the witness, and his opportunity for observation. *Hardy v. Merrill,* 56 N. H. 227, 241; *Schlencker v. State,* 9 Neb. 241; *Polin v. State,* 14 Neb. 540, 546; *Burgo v. State,* 26 Neb. 639, 643; *Connecticut Mutual Life Ins. Co. v. Lathrop,* 111 U. S. 612, 619; *State v. Lewis,* 20 Nev. 333. This evidence should have been received, and its exclusion was error."

We hold, therefore, that the court erred in not permitting the nonexpert witnesses, who qualified under the above rule, to give their opinion as to the mental competency of Mrs. Kehl. It is a fact that the jury are entitled to consider.

The question of mental incompetency is ordinarily one for the jury. In the case at bar, the relatives, neighbors and friends of Mrs. Kehl testified to their long acquaintance with her, to incidents in her life that indicate that she was not rational, and to facts showing that she was infirm because of age, accident and disease. The plaintiff made no attempt to contradict this evidence. One expert was called who testified in answer to a hypothetical question that, in his opinion, Mrs. Kehl was incompetent, but, when other facts were added to the question that were supported by the evidence, said that he could not correlate the two sets of facts and could form no opinion if all were true. Clearly, it is for the jury to determine the

facts. Competent evidence of Mrs. Kehl's incompetency was before the court. Under such circumstances the court erred in directing a verdict against intervener. This court has repeatedly held: "If there be any testimony before the jury by which a finding in favor of the party on whom rests the burden of proof can be upheld, the court is not at liberty to disregard it and direct a verdict against him. In reviewing such action, this court will regard as conclusively established every fact which the evidence proves or tends to establish, and if, from the entire evidence thus construed, different minds might reasonably draw different conclusions, it will be deemed error on the part of the trial court to have directed a verdict thereon." *Bainter v. Appel*, 124 Neb. 40.

For the reasons herein set out, the judgment of the trial court is reversed and the cause remanded.

REVERSED.