Glessner, Excrx., Appellant, v. Security-Peoples Trust Company et al.

Argued April 11, 1944. Before KELLER, P. J., BALD-RIGE, RHODES, HIRT, KENWORTHEY, RENO and JAMES, JJ.

*A. Grant Walker,* with him *Gunnison, Fish, Gifford* and *Chapin,* for appellant.

*Burton R. Laub,* with him *Henry G. MacDonald,* for appellee.

OPINION BY JAMES, J., September 28, 1944:

This appeal involves the same savings account in the Security-Peoples Trust Company of Erie, Pa., which was before us in *Smith's Estate,* 141 Pa. Superior Ct. 571, 15 A. (2d) 523. We there held that the Orphans' Court had no jurisdiction to determine the ownership of the account.

On December 5, 1940, Dessie Glessner, as executrix of the Estate of Archie Smith, alias Charles Jones, deceased, filed a bill in equity to determine the ownership of the fund against the bank and Thomas Shreve, who claimed the fund by virtue of the right of survivorship in a joint account. Both defendants filed answers, hearings were held and a final decree was entered by the court below holding that the transaction between Charles Jones and Thomas Shreve was a gift inter vivos with such delivery as to divest the donor of all dominion over the property and to invest the donee with complete control thereof and directed the balance in the account to be paid to Thomas Shreve. This appeal followed.

Archie Smith, alias Charles Jones, had been a railroader in the vicinity of Erie for many years and had

retired on a pension. On August 13, 1937, as Charles Jones, he opened a savings account in the Security-Peoples Trust Company of Erie, depositing $1,850. He was then living with Thomas Shreve, his cousin, in the city of Erie, and owing to ill health, continued to live there until December, 1938, when he left on a trip. On January 11, 1938, decedent, accompanied by Thomas Shreve, called at the Trust Company. They executed together, on the reverse side of the signature card which had been executed at the time of the original deposit, an agreement concerning the savings account, under seal and witnessed by W. G. Hewitt of the Trust Company. The agreement was as follows:

"Joint Account—Payable to Either or Survivor

"We, the undersigned depositors agree that any money placed in this bank account shall be deemed to belong to us as joint tenants and not as tenants in common subject to check by either of us; and in case of the death of either, the Security-Peoples Trust Company is hereby authorized and directed to deal with the survivor as sole and absolute owner thereof.

"Witness our hands and seals this 11 day of January, 1936.

"Charles Jones     (Seal)

"Thos. Shreve     (Seal)

"Witness:

"W. G. Hewitt

On the day the agreement was signed the deposit book was placed in a desk drawer at the home of Shreve where, excepting when used for deposits and withdrawals, it remained until the latter part of February or early part of March, 1939, when it was turned over to Jones at the Ford Hotel.

In December of 1938 decedent left on a trip to Florida and then to California. While in Los Angeles, California, on January 11, 1939, decedent wrote to the bank as follows:

"Gentlemen: My bank book is at 432 E-18th Street, your city, just call up Thomas Shreve, and ask him to bring the book down, and send me one hundred dollars at once, as I have not received my check, and I'm here in Los Angeles, Sick and without funds. Please do this at once, and oblige

Yours very truly,

(Signed) Charles Jones"

In compliance with this letter the bank sent a check to decedent in California.

On February 13th, still at Los Angeles, California, he wrote to Dessie Glessner, another cousin living in the city of Erie, enclosing a will in which he made Dessie Glessner his sole legatee and the executrix of the will. In the letter accompaning the will appears the following: "Dear Cousin Dess Dess I am sending you a will which I want you to have if anything happens to me I gave Shreves an insurance policy 2000 which I have kept up for 39 years I have about 17 hundred Dollars in the bank in Erie Peoples Trust Company......" In 1937 decedent had made Shreve beneficiary of an insurance policy for $2,000 in the Brotherhood. The premiums were paid by Shreve from the date of the designation to the date of Jones' death.

Decedent returned from California to Erie on February 23, 1939 and lived at the Ford Hotel for about nine weeks. He then went to live with the Glessners, where he remained for a period of five weeks and on June 1, 1939 was sent to St. Vincent's Hospital, where he died on June 12, 1939. On his return from California decedent was in bad health and required attention until his death.

On several occasions, while Jones was at Glessners, he gave the deposit book to Shreve, who made withdrawals on May 22nd and May 29th, 1939 of $25 each, returning the book to Jones after the first withdrawal but thereafter keeping the book in his possession until Jones' death.

The joint agreement is on the reverse side of the card used by the bank in the original deposit of August 13, 1937. On the face of the card appear the signatures of Charles Jones and Thomas Shreve, the latter's signature undoubtedly placed on the face of the card when the joint agreement was signed. W. G. Hewitt, who accepted the original deposit and was present at the execution of the joint agreement, testified as follows: "All I can recall is that they both came in and wanted it to be made in a joint account, that is both Mr. Shreve and Mr. Jones would appear on that book and as I would take it for access to that account"; and further testified: "Q. Do you ever explain to persons that open this kind of an account, that the survivor gets the balance of the account, unless you are asked about it? ......A. Well, I don't. Ordinarily I wouldn't explain that unless I thought there was some doubt in their mind, or they asked some questions concerning it. Ordinarily it is just a matter of signing the cards and fixing up the pass book."

From the date of the first deposit on August 13, 1937 to May 1, 1939, when decedent was at Glessners, no deposits were made by Shreve but $823.19 was deposited by the decedent. During this period $935 was withdrawn, all of which, excepting a withdrawal of $25 by Thomas Shreve on June 23, 1938, was withdrawn on orders signed by Jones. On May 1st and 2nd, 1939, $27.85 was deposited. From May 22, 1939 to June 12, 1939, date of decedent's death, on withdrawal orders of Shreve, $245.18 was withdrawn for the payment of hospital and nursing expenses, including $50 to Shreve for expenses incurred and $80.18 for Dessie Glessner for nursing and board. After Jones' death $386.74 was withdrawn by Shreve in payment of debts of decedent, leaving a balance of $1,144.12. The only other asset of the estate was a boat house valued at $250.

Considerable testimony was offered by both parties of acts and declarations of decedent for the purpose of

throwing light upon the transaction of January 13, 1938, which briefly set forth is found in the court's discussion where it says: "Many statements claimed to have been made by Jones subsequent to the transaction, were offered in evidence, over objection of Shreve, to show that Jones's intention was to constitute Shreve his agent for his own convenience and that the purpose was not to give the account away. Tesimony of other witnesses was introduced by Shreve to the effect that Jones had stated an intention to give Shreve the account."

In entering its final decree the court below excluded· from consideration the oral statements made by decedent concerning the nature of the bank account and the principal question for us to determine on this appeal is, was the transaction between the decedent and Thomas Shreve so clearly shown as to exclude any parol evidence concerning the transaction?

It is familiar law that to constitute a valid gift inter vivos the evidence must clearly show an intention to make the gift and a delivery, actual or constructive, of a nature sufficient not only to divest the donor of all dominion over the property but also to invest the donee with complete control of the subject matter of the gift. *Chapple's Estate,* 332 Pa. 168, 2 A. (2d) 719; *Ries v. Ries's Estate,* 322 Pa. 211, 185 A. 288.

"In determining whether there was a valid gift we must confine our inquiry to what transpired at the time the gift was supposed to have been made......" *Packer v. Clemson,* 269 Pa. 1, 112 A. 107) and if the evidence thus clearly established that a valid gift was intended "...... nothing that happened thereafter without the donee's consent will invalidate it; if the intention is not clearly manifest, subsequent acts may aid in clarifying that intention." *Packer v. Clemson,* supra; *Chapple's Estate,* supra.

What was in the mind of the decedent, Charles Jones, at the time the joint account was entered, does

not appear from the witness who entered the joint account further than that a joint account was to be entered, but no mention made of the right of survivorship. He neither read nor explained the nature of the agreement that was about to be executed. In considering his testimony we should not overlook the circumstances that the survivorship account was entered upon the reverse side of the original deposit card, either for the convenience of the bank or the employee. Under such facts we are of opinion that decedent's intentions were not so manifest as to preclude the declarations and acts inconsistent with the apparent agreement. From January 13, 1938 to May 1, 1939, except on one occasion, every transaction relating to this account was the act of the decedent and indicated decedent's belief in his right of control and dominion over the account and that the placing of the account in their joint names was merely a convenience in the withdrawal of the funds.

True, these acts are also consistent with decedent's intention to establish a joint account with the right of survivorship, yet, in determining what was the intention of the decedent, his acts and declarations subsequent should have been considered by the court below in reaching its conclusion.

The court below relied upon *Reese v. Philadelphia Trust Company,* 218 Pa. 150, 156, 67 A. 124 and *Mardis v. Steen,* 293 Pa. 13, 141 A. 629, in holding that the gift inter vivos was fully completed. In the Reese case an officer of the bank testified that he was present when the donor gave the box and its contents to the donee and wished him to act as a witness to the transaction; in *Mardis v. Steen,* supra, no testimony was offered to question the agreement under which the monies were deposited. There can be no question but that a deposit agreement, creating a joint tenancy with the right of survivorship, where there is affirmative evidence that it was the intention of the parties that the account

should be so held, is an enforceable agreement but we are unable to find any authority which goes so far as to hold that testimony which throws light upon the intentions of the parties is not to be considered; its weight and probative value, however, if sufficient, being a question for the jury or the court, dependent upon the tribunal passing upon the question.

In *Mader v. Stemler,* 319 Pa. 374, 379, 179 A. 719, the court recognized the force of this reasoning when it stated: "It is conceivable that, while invested with a joint interest in the bank's obligation, the appellant, by some other contract with Stemler for the benefit of all the children may have received the money for their benefit......" holding, however, that the evidence was insufficient in that case.

In *Zellner's Estate,* 316 Pa. 202, 205, 172 A. 715, wherein many of the cases relating to joint accounts are cited and discussed, it was said: "The distinction between the two lines of decisions is that in the cases where a joint tenancy with the incident of survivorship was held to have been created, there was affirmative evidence that it was the intention of the parties that the account should be so held; in the Mardis and Reap cases there were express written, signed and witnessed declarations to that effect, while in the Bailey (Bailey's estate, 86 Pa. Superior Ct. 322. Parenthesis ours) case the accounts concerned were composed of moneys derived from the sale of property owned jointly. On the other hand, in the cases cited where a joint tenancy was held not to have been created, the evidence was insufficient to show any intention to give to the party whose name was added any present beneficial interest in the fund."

In *Balok Estate,* 151 Pa. Superior Ct. 592, 30 A. (2d) 664, and *Lochlinger v. Hanlon,* 348 Pa. 29, 33 A. (2d) 1, oral evidence was introduced to prove the intention of the donor.

It is not our province on this appeal to decide the facts; that is for the court below, sitting as a chancellor; but in arriving at its findings of fact, the acts and declarations of the decedent, at the time the joint account was entered into and subsequent thereto, should have been considered.

The decree is reversed and the record is remitted with directions to the court below to consider the acts and declarations of the decedent in determining the ownership of the fund.