HERMAN F. CROWELL, APPELLEE, v. HARLAND S. MILLIGAN, ADMINISTRATOR OF THE ESTATE OF RENA S. MILLIGAN, DECEASED, APPELLEE, IMPLEADED WITH VIOLA MAE MILLIGAN ET AL., APPELLANTS.

59 N. W. 2d 346

Filed June 12, 1953. No. 33215.

128

*George B. Boland* and *Harry N. Larson,* for appellants.

*Spear & Lamme* and *Swarr, May, Royce, Smith & Story,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, CHAPPELL, WENKE, and BOSLAUGH, JJ.

SIMMONS, C. J.

Plaintiff in this action is the president of the Crowell Elevator Company, a corporation.

One of the defendants is the administrator of the estate of Rena S. Milligan, deceased. The deceased was a maiden lady, who lived to advanced years and accumulated a considerable estate. She was frugal with her expenditures so far as she herself was concerned. She was quite generous with relatives and friends. She directed her own business affairs. She consulted with and trusted the plaintiff on many matters of business.

She died intestate October 24, 1950.

The defendant Viola Mae Milligan was a sister-in-law of deceased. The defendant Elizabeth M. Mathewson was an old friend of deceased and a beneficiary, at least on one occasion, of deceased's generosity.

Plaintiff brings this action as a stakeholder to determine the ownership of three items of personal property which he holds. The issues go to whether or not the property belonged by gift inter vivos to the two women defendants or to the administrator for the estate.

For convenience we will refer to the deceased as Rena, to the alleged donees as Viola and Elizabeth, and to the administrator by that designation.

The trial court decreed that the property belonged to the estate. Viola and Elizabeth appeal. We affirm in part and reverse in part.

There is evidence that plaintiff discussed with Rena the matter of making a will, and she declined, stating that she would have all of her property disposed of at the time of her death.

Viola was the second wife of Rena's brother. He died intestate. There is evidence that Rena considered that Viola did not receive her proper share of the property of her husband's estate.

Rena had for years paid money to the Crowell Elevator. Company to be held for her. The company mingled these funds with its own and paid out funds at Rena's direction. It was a debit and credit account on the company books.

Rena was the owner of a block of stock of the elevator company.

At different times Rena discussed this money and the stock and its disposition with plaintiff. After such a conversation in late October 1947, plaintiff dictated a letter directed to the elevator company which contained the following two paragraphs: "Will you please transfer all stock of your company now issued in the name of Rena S. Milligan to 'Rena S. Milligan and Viola M. Milligan as Joint Owners with Rights of Survivorship.' Will you please transfer any funds that now stand to my credit on the books of. Crowell Elevator Company to account which is to be known as 'Rena S. Milligan and Viola M. Milligan as Joint Owners with Rights of Survivorship.' " This was prepared for Rena's and Viola's signatures. It was mailed to Rena. She did not return it at once.

On December 1, 1947, plaintiff wrote Rena calling her attention to the matter and stating: "We would have to have these before we can transfer your stock or your account into joint ownership. We have heard nothing from you and wonder if you still want to put this into effect." Thereafter, in late December 1947, Rena and Viola came to the office of the plaintiff and Rena signed the letter. Viola signed below: "Approved: Viola M. Milligan." The letter, so signed, was delivered to the plaintiff. Thereafter a new certificate of stock was issued reciting that "Rena S. Milligan and Viola M. Milligan as Joint Owners with Rights of Survivorship are the owner of" the shares involved. This stock was mailed to Rena January 14, 1948. She receipted for it and returned it to plaintiff. On January 30, 1948, plaintiff, signing as "President," acknowledged receipt of the

stock and that it was being held "subject to your instructions." Viola never had the stock in her possession. Dividends were thereafter paid to Rena. Rena signed the proxy authorizations for the annual meetings. After Rena's death a dividend check was issued payable to Rena and Viola and held by the company pending the disposition of this action. Our determination herein as to the ownership of the stock includes that dividend.

Plaintiff testified that he had Viola sign the approval of the letter of October 25, 1947, as "a good idea, seeing she had an interest in those bonds at the time." He also testified that Rena "intended" to control the property during her lifetime and to handle and treat it as her own during her lifetime. These were obviously his conclusions. Viola testified that she never claimed any share of the dividends and considered they were Rena's property, and that she took it for granted that Rena meant the stock was to remain hers (Rena's). She testified that Rena said, "if anything happens to her it would go to me and if anything would happen to me it would go back to her."

At the end of October 1947, Rena had a credit balance with the company of $7,513.53. On January 6, 1948, after the execution and delivery to it of the letter of October 25, 1947, this account was set up on the books of the company under the heading: "Rena S. Milligan and/or Viola M. Milligan."

On September 16, 1949, plaintiff wrote a letter to Rena with reference to Rena's agreement to pay him $50 a month for his services. The letter contained this statement: "As I understand it, you wish to deposit certain funds with me from time to time, which I will carry for you in a special bank account. Also, from time to time you will instruct me to pay out funds from this account on your order." Also, on the same day, Rena signed a letter directed to plaintiff, the body of which is as follows: "This will be your authority to transfer the funds now held by Crowell Elevator Company in an

account known as 'Rena S. Milligan and/or Viola May Milligan as Joint Tenants and not as tenants in common, with rights of survivorship', to an account in the Omaha National Bank known as 'Herman F. Crowell, Agent'. Deposits to this account and charges against it will be in accord with your letter to me of September 16, 1949, and accepted by me. The funds in this account at the Omaha National are for 'Rena S. Milligan and/or Viola Mae Milligan as Joint Tenants and not as tenants in common, with rights of survivorship', but can only be drawn out on your signature while the agreement in the aforesaid letter remains in force." As to this letter plaintiff testified: "Yes. That is the funds that we had held, joint account, that we had held, Rena Milligan and Viola Milligan on Crowell, Elevator Company books; they wanted that transferred to the bank account as confirmed in the other letter."

On September 22, 1949, the balance in that account was $3,719.36. On that day the account was balanced and that amount deposited in the Omaha National Bank under the name of "Herman F. Crowell, Agent." Thereafter the funds were deposited and handled through that account. At the time of Rena's death an amount in excess of $11,000 was in the account. The plaintiff kept a ledger account of it under the name of "Herman F. Crowell, Agent Bank account of Rena S. Milligan and Viola M. Milligan, as joint tenants."

There is evidence that all funds paid into or out of this account were done by and at the direction of Rena. Viola testified that she did not have knowledge of the fund in the bank until after Rena's death. However, without question she had knowledge of the fund while it was being held in the elevator company accounts.

We have held in In re Estate of Scott, 148 Neb. 182, 26 N. W. 2d 799: "The essential elements of a gift inter vivos are donative intent, delivery, and acceptance.

"Once it is ascertained that it was the intention of the donor to make a gift inter vivos of an undivided interest

in a chattel or chose in action, and all is done under the circumstances which is possible in the matter of delivery, the gift will be sustained.

"In such cases, the delivery may be symbolical or constructive if as nearly perfect and complete as the nature of the property and the attendant circumstances will permit."

As of the time of the writing of the letters and the action taken by plaintiff immediately thereafter there was a patent donative intent as to the elevator stock and the money. The question comes as to whether or not the separate actions of Rena subsequent to the writings, the reissue of the stock, and the transfer of the funds; the construction later placed by the plaintiff on the rights of the parties; and the views of Viola as to her rights are to be considered on the question of intent.

The rule is that where the intention to make a gift is not clearly manifested, subsequent acts may aid in clarifying that intention, but where the intention is clear, inquiry must be confined to what occurred at the time of the transaction. In re Chapple's Estate, 332 Pa. 168, 2 A. 2d 719, 121 A. L. R. 422; Glessner v. Security-Peoples Trust Co., 156 Pa. Super. 56, 39 A. 2d 165; Dinslage v. Stratman, 105 Neb. 274, 180 N. W. 81, 14 A. L. R. 702; Annotations, 1 A. L. R. 1241, 105 A. L. R. 402.

As of the time of the letter of October 25, 1947, and immediately thereafter, there was also a delivery of the stock and money to Viola and Rena jointly with rights of survivorship as the circumstances required. By endorsing her approval on the letter Viola accepted the gift.

There is a contention made that plaintiff held the stock and the money as Rena's agent solely. Whatever plaintiff's status was before reissue of the stock and the book transfer of the funds is not material. After that time it is patent that he held for both Rena and Viola.

In the letter dated October 1947, it is noted that the designation "Joint Owners with Rights of Survivorship"

is used as to both the stock and the money. We need not decide whether by the use of "joint owners" a joint tenancy or tenancy in common was created. Since the passage of section 76-118, R. R. S. 1943, when read in connection with the definition of "property" in section 76-101, R. R. S. 1943, there remains no question of the right of an owner of property to convey to himself and another and thereby create a joint tenancy, tenancy in common, or tenancy in partnership.

It is clear that it was intended that the right of survivorship exist. That was the real object in view. That right of survivorship is to be carried out in accord with the intent of the donor. Anson v. Murphy, 149 Neb. 716, 32 N. W. 2d 271.

Accordingly we hold that there was a complete gift inter vivos, and the title to and right of possession of the Crowell Elevator stock, held by plaintiff, vested absolutely in Viola upon the death of Rena, and that judgment should be entered accordingly, and that the trial court erred in holding otherwise.

We also hold that there was a completed gift inter vivos of the funds standing to the credit of Rena with the Crowell Elevator Company in 1947 and that Viola thereby became a "joint owner" of that chose in action, with rights of survivorship. The gift transaction was consummated in both instances when the transactions involving the gift had been completed.

The administrator contends, however, that in the event we reach that conclusion, that relationship and interest was severed by Rena when in September of 1949, she, without the knowledge or consent of Viola, directed that the funds there held in the account be transferred to a bank, to be there deposited in the name of "Herman F. Crowell, Agent," to be paid out only on the order of Rena. It is to be remembered that at that time Rena directed that those funds were for Rena "and/or" Viola as "Joint Tenants and not as tenants in common, with rights of survivorship."

There was obviously no intent on Rena's part to cut Viola out of her interest in the fund. Quite clearly she intended that that interest, theretofore existing, should continue. Rena did not destroy the fund. She directed its deposit in a bank instead of with the elevator company. She did not undertake to divest Viola's interest, but rather recognized that it continued. She did not claim exclusive ownership of the fund. She recognized Viola's interest in the fund.

The question then comes, did she have the power to divest Viola's interest in the fund by the act of claiming the right to withdrawals of money from the fund.

The administrator cites no authority for his contention that Rena severed the interest of Viola by the 1949 directions as to the fund.

It is patent if Viola's interest in the fund was that of a tenant in common, Rena could not ex parte divest that interest. If we treat it, as Rena did in the 1947 letter, as a joint tenancy, then the same result follows.

It is to be remembered that we are here dealing with a case where one of the two joint owners, of a fund held with rights of survivorship, is dead. We are not dealing with a case involving the rights of each in the fund while both are living.

The courts of other jurisdictions have considered the question and arrived at the rule that: One of two joint owners of money, deposited in a joint account payable to either or the survivor, cannot divest the survivorship right in the jointly owned account by withdrawing the money and depositing it in his individual account, without the knowledge and consent of the other.

O'Connor v. Dunnigan, 158 App. Div. 334, 143 N. Y. S. 373, affirmed in 213 N. Y. 676, 107 N. E. 1082, presented these facts. Money was originally deposited "Payable to 'Mary Guilfoyle or Joseph Guilfoyle. Pay to either or the survivor of either.' " Mary withdrew the money, without the knowledge or consent of Joseph. and deposited it in her own name. She made a will, and then

died. Her executrix claims the property as against Joseph. There existed an evident intent to divest the joint ownership. Here such an intent is negatived by the letter of Rena of September 1949. The court held that the original source of the money was immaterial and that the form of the deposit indicated an intent to create a joint ownership with right of survivorship. The court further held: "As between the bank and Mary Guilfoyle she had the right with the possession of the book to withdraw the moneys from the account. Her change of the moneys, however, from this account to another in her individual name, in the absence of and as far as appears without the consent of Joseph Guilfoyle, could not divest Joseph Guilfoyle of his joint ownership in the property. It would be preposterous to claim that an appropriation of personal property by one joint owner to his personal use could divest the interest of the other joint owner, or could in any way be presumed to have been by the consent of his co-owner. In order to change the joint ownership which presumptively existed defendant was required to show that the ownership of Joseph Guilfoyle has been voluntarily surrendered."

State v. Gralewski's Estate, 176 Or. 448, 159 P. 2d 211, 161 A. L. R. 66, presented this set of facts. There a father deposited money in two banks in the joint accounts of himself and his son. The agreement in one instance provided that the money " 'shall be paid * * * to us or either of us, or the survivor of us,' " in the other " 'payable to the undersigned or the survivor.' " The son caused the two joint accounts to be withdrawn and re-deposited in his own name. The father was insane at that time and could not consent. The son made a will, then died, the father surviving and died later. The state claimed the money as belonging to the father and on the ground that it had escheated to the state, it being undisputed that the father died intestate and without heirs. The court held that the property escheated to the state. It held: "* * * the codepositors became each vested with a

joint and equal interest in the deposits with the right in the survivor to succeed to the full ownership of the balance in the accounts at the death of his cotenant." The court held that to sustain the position of the beneficiaries of the son's will "would be to approve the unauthorized invasion by one of another's legal rights" and that the son "could not by his unilateral action divest his father of his interest." The court quoted from O'Connor v. Dunnigan, *supra*, reviewed and cited the decisions of other states, and held: "We think that the rule announced in New York, and followed in some of the other states, is consonant with justice and principles of fair dealing, and will serve to protect the legitimate property interests of the parties to joint bank accounts. Although we have spoken of those interests as those of joint tenants, it is obvious that a joint bank account does not have all the incidents of a joint tenancy at common law. 'But it likens itself to a joint tenancy, for the transaction of a joint deposit such as that with which we are here concerned creates a joint ownership with the right of survivorship': (citing authorities) That right is its 'grand incident,' and in our opinion the withdrawal by one depositor, without the other's consent, of the entire deposit, and for the manifest purpose of defeating his codepositor's survivorship right, is a violation of the understanding between the parties, as evidenced by the deposit agreement, and an attempted invasion of such codepositor's title. It does not effect a severance of the joint tenancy, but, as the authorities upon which we rely hold, results only in a change in the form of the deposit, while its joint character and the rights therein of the respective parties remain unaltered."

Moskowitz v. Marrow, 251 N. Y. 380, 167 N. E. 506, 66 A. L. R. 870, presented, as to two of four deposits there considered, this set of facts. There a grandmother, with substantial accounts in two banks, directed that the money be transferred to a new account payable to " 'either or the survivor of them.' " The pass books

were delivered to the granddaughter. Later the grandmother revoked the " 'privilege' " accorded the granddaughter and instructed the banks to honor no signature other than her own for any withdrawals. After the grandmother's death a controversy arose as to the ownership of the deposits. The question was whether or not the order to permit no withdrawals was effective to divest the rights of the granddaughter. The court held first that under their earlier decision the mere delivery of the pass book was insufficient to effectuate delivery since the delivery of the pass book could be an equivocal act either to consummate a gift or satisfy the purposes of convenience.

The court then turned to the provisions of their statute. The statute considered has substantial analogy to our section 8-167, R. S. 1943, which provides: "When a deposit in any bank in this state is made in the name of two or more persons, deliverable or payable to either or to their survivor or survivors, such deposit, or any part thereof, or increase thereof, may be delivered or paid to either of said persons or to the survivor or survivors in due course of business."

Under this provision we have held: "Section 8046, Comp. St. 1922, relating to the payment by a bank of deposits entered as payable to any one of two or more persons named therein, not only is intended for the protection of the bank, but also fixed the property right of the persons named, unless the contrary appears from the terms of the deposit." We also said: "While it may be conceded the husband in fact made the deposit, he certainly, by that deposit, gave his wife an indivisible and unseverable interest in the deposit. It must, therefore, be an interest in the nature of a joint tenancy with the attendant right of survivorship." In re Estate of Johnson, 116 Neb. 686, 218 N. W. 739.

We followed that decision in Kehl v. Omaha Nat. Bank, 126 Neb. 695, 254 N. W. 397, and there held: "Where a wife deposited money in a bank payable to

herself or husband as joint tenants with a right of survivorship, and not as tenants in common, a completed gift is consummated by the wife to the husband, notwithstanding the fact that the husband never had manual possession of the pass-book.

"A deposit of money in a bank by a wife and made payable to herself and husband, with the express provision that it was a joint tenancy with survivorship, and not as tenants in common, is presumed to have been made by the wife with donative intent and for the benefit of the husband with the intention of giving to him, if he survives, the complete title to the funds * * *."

In McConnell v. McCook Nat. Bank, 142 Neb. 451, 6 N. W. 2d 599, we removed the "close relationship of the parties" as a determining element. We followed these cases in Young v. McCoy, 152 Neb. 138, 40 N. W. 2d 540, and again in Scriven v. Scriven, 153 Neb. 655, 45 N. W. 2d 760.

Returning to the Moskowitz case the court analyzed their statute as follows: "* * * we find that section 249 in terms declares that, where a deposit is made by one person in his name and that of another person, payable to either or the survivor, the deposit and any additions thereto 'shall become the property of such persons as joint tenants;' that they 'shall be held for the exclusive use of such persons;' that they 'may be paid to either during the lifetime of both or to the survivor after the death of one of them.'" The court held: "That the purpose and effect of the enactment was to reverse the common-law rule and to make a deposit in the statutory form presumptive evidence of an intent to make a gift presently to take effect * * *. Assuming that, upon the making of the deposits by Fannie Manheimer, in the joint names of herself and Pearl Harris, the two became 'joint tenants,' it is immaterial whether Pearl Harris then acquired an interest in a moiety or an interest in the whole of the funds deposited. If she received the former, rather than the latter, to that extent at least

the deposit was irrevocable, since she had acquired a vested property interest. Even if Fannie Manheimer possessed the power, by transferring her interest to another, thereby to sever the joint tenancy, and prevent survivorship, in fact this was never done, so that the title to the balance would have passed to Pearl Harris, as survivor." It, however, was contended: "* * * that even though the deposits in the joint account, to the credit of Fannie Manheimer and Pearl Harris, payable to either or the survivor, constituted a joint tenancy, the transfer possessed a tentative character and, not being completed until survivorship ensued, was meanwhile revocable by the original depositor." The court then cited and quoted from O'Connor v. Dunnigan, *supra,* and said of that case: "It was decided upon common-law principles without reference to the provisions of that section which had been enacted prior to the decision. It is important upon this issue, however, as a holding that a joint tenancy, which may result from a deposit in joint account, is a true joint tenancy, the transfers involved in the creation of which are irrevocable at the instance of either depositor, to the extent of the funds by him deposited. If this be true of common-law deposits to joint account, it must be equally true of deposits made under the provisions of the statute."

The court then held that "for all these reasons" the grandmother, "in originally making the joint deposits, transferred to" the granddaughter "a present property interest in the moneys deposited, which was not subject to cancellation at the instance of" the grandmother "and was not destroyed or in the least affected by the notice not to pay * * * served upon the banks." There was a concurring opinion by Cardozo, C. J., in which five other members joined. In the course of that opinion it was said: "If the form of the deposit was an expression of the true agreement, there could be no change of ownership thereafter by an ex parte declaration. As to what the true agreement was, the door to contro-

versy was open during the joint lives of the depositors. It was closed upon the death of either. * * * title to the accounts was unaffected by the notice of withdrawal in the absence of a showing that by implication, if not otherwise, the privilege of withdrawal was one of the terms of the deposit. Such a showing was permissible during the joint lives, for it was then opposed by nothing except a presumption to the contrary. It was no longer permissible after either depositor was dead, for it was then opposed by a presumption declared to be conclusive."

In re Culhane's Estate, 334 Pa. 124, 5 A. 2d 377, involved this fact situation. Two joint owners had a deposit in a trust company which failed. The receiver made percentage distribution to one of the joint owners who deposited the money in a safety box. When she died $1,900 from that source remained in the box. The other joint owner was awarded the sum so deposited. The court held: "The account—a chose in action—belonged to both as in joint tenancy. The provision in the contract that 'either of us may draw and receipt for the whole or any part thereof' meant that either had authority as agent for the joint owners to withdraw and receipt on behalf of both exactly as if they had appointed some third party to be their agent for the purpose."

Daniels v. Harney, 111 Cal. App. 2d 400, 244 P. 2d 773, involved three bank accounts held in joint tenancy. One joint tenant withdrew the funds and then died. The proceeds were in the hands of the administrator. The court held that the surviving joint tenant was entitled to the money. The court said: "The settled rule in this state is that upon the death of one holding a joint tenancy in personal property, which is the case here, the whole interest vests in the surviving tenant, not by descent, but by the fact of survivorship alone. * * * Applying the principle to the facts of this case the rule is that were (where) one joint tenant without consent withdraws

the whole or part of the fund of a joint bank account during the life of both tenants the joint tenancy is not destroyed, the proceeds retain the joint tenancy character wherever they can be traced unless the character is changed by agreement of the parties and the deprived tenant can exercise his right of survivorship as to the entire fund which has retained the joint tenancy character."

Applying these rules to the facts here we hold that the rights of Viola, in the money held by the Crowell Elevator Company, was not destroyed by the act of Rena in directing that it be deposited in the Omaha National Bank, and that Viola has the right to trace that money and to be awarded that which has retained the joint-ownership character.

As hereinbefore pointed out there was $3,719.36 so transferred. As a result of additions and withdrawals from the Omaha National Bank fund the amount on deposit there was in excess of $11,000 at the time of Rena's death.

As to the additions made to the fund by Rena's deposits, although a donative intent appears, Rena held control of this money so that the requisite delivery to complete the gift is negatived. It appears from evidence in the record that, as a result of withdrawals, this fund on December 30, 1949, was reduced to the sum of $2,061.41, and that thereafter while the balance fluctuated it was at all times in excess of that amount. Viola's right in the fund is limited to that part of the jointly owned money which can be traced to and shown to have remained in the Omaha National Bank at the time of Rena's death. That sum is $2,061.41. Accordingly, we hold that Viola is entitled to be awarded that sum from the funds on deposit in the Omaha National Bank, and that the remainder is an asset of Rena's estate.

The third item of property involved here is some railroad bonds of a Republic of Mexico company. It appears that many years ago, as a result of a bank fail-

ure, Elizabeth's home was sold. Rena bought it and gave it to Elizabeth. Elizabeth in 1931 gave Rena bonds in the same company of an equal amount to that here involved, to compensate in part for the home.

In December 1944, Rena brought these bonds to plaintiff and said: "I don't know if they are any good, but if they are, if you ever get anything, give them to Mrs. Mathewson of Wakefield, she is a friend of mine, and I would like to do something for her." As a result of that conversation Rena signed a letter to plaintiff reciting that: "I hand you herewith twenty-four (24) first mortgage gold bonds of the Pan-American Railroad Company numbered 337 to 360 inclusive for $1,000 each. When and if you collect interest on these bonds, please forward the money to Mrs. Elizabeth Mathensen, Wakefield, Nebraska. Please hold the bonds until Mrs. Mathensen requests them, when you have my permission to deliver them to her." It is not disputed that the defendant was meant, although the last name was misspelled.

The bonds were left with plaintiff under that direction. At the time Rena said she had not told Elizabeth about what she was doing and instructed him not to tell Elizabeth of it. Elizabeth did not know about it until after Rena's death.

At the time of this delivery or shortly thereafter Rena asked plaintiff to get an idea as to the value of the bonds. Plaintiff did that and advised Rena thereof by letter dated January 13, 1945.

The bonds were bearer bonds. Pursuant to "Presidential Decree of the United States of Mexico" and at Rena's direction, plaintiff sent the bonds to a New York bank for registration "for exclusion from their assumed status under Mexican Law as 'Enemy Bonds'." They were there registered in Rena's name. However, that registration was one on the books of the bank. The payable-to-bearer provision of the bonds was not changed. The bonds were thereafter returned to plain-

tiff and held by him. No interest was paid on the bonds.

There is no question here as to donative intent of Rena as to these bonds. The question is one of delivery so as to make the gift effective inter vivos. It appears from the record that plaintiff was Rena's agent with instructions to deliver to Elizabeth when delivery was requested. Elizabeth did not know of the delivery to plaintiff. Rena, for a reason not disclosed, directed that plaintiff not tell Elizabeth. The bonds remained in plaintiff's hands when Rena died.

The rule is stated by the authorities as follows: "While delivery may be made by an agent of the donor, delivery to the agent is not enough. The gift is not complete until there is an actual delivery to the donee or to someone for him, and until the gift is completed by delivery, the donor may reassert title to the property. Moreover, since the authority of an agent is revoked by the death of his principal, the death of the donor before the actual delivery of the property to the donee terminates the authority of the agent to make such delivery, and works a revocation of the gift." 24 Am. Jur., Gifts, § 30, p. 747. "While a delivery may be made to a third person in order that the latter may deliver the subject of the gift to the donee as agent of the donor, the gift is not complete until there is an actual delivery to the donee; and until the gift is completed by delivery the donor can revoke the agent's authority and resume possession of the gift. As the authority of an agent is revoked by the death of his principal, the death of the donor before the actual delivery of the property to the donee terminates the authority of the agent to make such delivery, and the gift, therefore, fails for want of delivery, * * *." 38 C. J. S., Gifts, § 25, p. 804.

The above rule was cited with approval in Ladman v. Farmers & Merchants Bank, 130 Neb. 460, 265 N. W. 252. Accordingly, it is held that the attempted gift of the bonds to Elizabeth failed for want of delivery in

the lifetime of Rena. The trial court did not err in so deciding.

The judgment of the trial court is affirmed in part, and in part reversed and the cause remanded with directions to enter a decree that the elevator stock held by plaintiff passed by right of survivorship to Viola and that it be delivered to her; also that of the money on deposit in the Omaha National Bank $2,061.41 be paid to Viola and the balance be paid to the administrator; and that the railroad bonds be delivered to the administrator.

All costs are taxed to the administrator.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED WITH DIRECTIONS.

CARTER, J., dissenting.

The deceased died on October 24, 1950, at the age of 80 years, leaving an estate valued in excess of $465,000. She was unmarried and, according to the evidence, eccentric to the extent that she did not trust bankers and lawyers. This evidently accounts for her failure to patronize banking institutions and to make a will. The property here involved can readily be divided into three groupings: (1) 205 shares of stock in the Crowell Elevator Company, (2) a cash balance of $11,163.12 on hand in the Omaha National Bank at the time of the death of Rena S. Milligan, and (3) 24 first mortgage gold bonds issued by the Pan-American Railroad Company. I shall deal only with items 1 and 2, as I agree with the disposition made of item 3 by the majority opinion.

The deceased wrote a letter to Crowell requesting that the elevator stock and her money in the hands of the Crowell Elevator Company be transferred to "Rena S. Milligan and Viola M. Milligan as Joint Owners with Rights of Survivorship." This letter was approved by Viola M. Milligan. A new stock certificate was issued in the form requested and mailed to deceased individually. She returned the stock certificate to Crowell, who in receipting for it by letter said in part: "(I) ac-

knowledged the instructions she gave me to hold it in our vault for further instructions." Crowell still held the stock on the death of the deceased, subject to her instructions. Dividends were paid on this stock to Rena S. Milligan in 1948, 1949, and 1950 by checks paid to her individually. Voting proxies were mailed to Rena S. Milligan during this period and voted by her. Crowell testified that he dealt solely with Rena S. Milligan and that she intended to retain control during her lifetime and to handle and treat it as her own until her death. He said that only Rena S. Milligan told him what to do with the deposits, the stock, and the bonds, and that no other person attempted to do so. According to the evidence of Crowell, the stock certificate was never delivered to Viola M. Milligan, nor was he ever directed to do so by Rena S. Milligan during her lifetime. Viola M. Milligan testified that she never saw the stock certificate nor had it in her possession and that it was her understanding that if anything happened to Rena S. Milligan it would go to her; that she would get it after Rena S. Milligan passed away.

With respect to the money in the hands of Crowell, the record shows that after the account with the Crowell Elevator Company had been changed to "Rena S. Milligan and/or Viola May Milligan as Joint Tenants and not as tenants in common, with rights of survivorship," Rena S. Milligan directed them to be transferred to an account in the Omaha National Bank identified as "Herman F. Crowell, Agent." The directions provided that these funds could be drawn out only on the signature of Rena S. Milligan while the agreement contained in the letter of September 16, 1949, was in force. That letter, signed by Crowell and Rena S. Milligan, said in part: "As I understand it, you wish to deposit certain funds with me from time to time, which I will carry for you in a special bank account. Also, from time to time you will instruct me to pay out funds from this account on your order." The bank account was thereafter estab-

lished in the name of "Herman F. Crowell, Agent." There was $3,719.36 in the account when the "Herman F. Crowell, Agent" bank account was established. There was $7,489.53 in the account when the alleged joint account was set up on the books of the Crowell Elevator Company. There was $11,163.12 in the account when Rena S. Milligan died. All funds deposited were those of Rena S. Milligan, and Crowell followed Rena S. Milligan's instructions regarding the account. Viola M. Milligan never drew on the account nor requested permission to do so. She said she never knew of the existence of this bank account until Crowell told her about it after the death of Rena S. Milligan.

The controlling rule is set out in First Trust Co. v. Hammond, 140 Neb. 330, 299 N. W. 496, in the following language: "To make a valid and effective gift inter vivos, there must be an intention to transfer title to the property, and a delivery by the donor and acceptance by the donee, and the transfer must be so complete that if the donor again resumes control over it without the consent of the donee he becomes liable as a trespasser."

There is, of course, evidence of a donative intent to become operative at her death. This constitutes it a testamentary disposition of the property which can be lawfully accomplished only by compliance with the statute of wills. But in each of the three groupings of property presently before the court, Rena S. Milligan never lost dominion over or control of the property. She never intended to lose control of it during her lifetime, and the evidence of Crowell and Viola M. Milligan affirmatively so shows. There was never an attempt by the donee to take control of the property because the deceased very carefully saw to it that it was to be hers and under her control until her death. As to the stock in the Crowell Elevator Company, she caused the certificate to be changed, but she alone retained its custody and placed it in Crowell's care subject to her instructions. She collected the dividends

personally, she voted the stock in corporate elections, she alone dealt with Crowell with reference to it, and Crowell testified that she at all times treated it as her own. The purported donee, Viola M. Milligan, said she claimed no interest in the stock or dividends during the lifetime of the deceased and that she considered that it belonged to Rena S. Milligan until her death. Clearly, there was no delivery of a present interest in the property, constructive or otherwise. With reference to the cash account, the record shows that Rena S. Milligan at all times during her lifetime retained control of it. Crowell, admittedly her agent, handled the account in accordance with written instructions which definitely provided that the funds could be drawn out only by Rena S. Milligan. All funds deposited were hers and all withdrawals were by her. The purported donee never knew about the account and never drew upon it, nor requested or insisted upon any right to do so. Control never passed and, necessarily, a gift inter vivos was not made.

We have said: "One of the essential elements of a gift is the intention to make it. A clear and unmistakable intention on the part of the donor to make a gift of his property is an essential element of the gift, and this contention must be inconsistent with any other theory. * * * While the theory of a gift has been presented and counsel has assumed that the transfer of the legal title might be sufficient to effectuate a gift, still the person asserting it must prove all the essential elements by clear, direct, positive, express and unambiguous evidence." Hild v. Hild, 135 Neb. 896, 284 N. W. 730. I submit that the evidence in this case does not come close to meeting these requirements.

I point out also that a transfer of stock on a corporation's books does not of itself constitute a delivery of the stock. § 21-201, R. S. 1943. See, also, Figuers v. Sherrell, 181 Tenn. 87, 178 S. W. 2d 629, 152 A. L. R. 420, wherein it is stated:

"It may be conceded that Sherrell had the intention of giving these shares of stock to his nephew at some future time when he procured the certificate to be issued in the name of the latter. All the subsequent conduct of Sherrell however negatived the idea that he had any intention of giving to his nephew a present interest in the stock and a transfer of the present interest is necessary to the completion of a gift inter vivos. Chandler v. Roddy, *supra.*

"We think that Sherrell never parted with his dominion and control over these certificates of stock issued in the name of the complainant but delivered to Sherrell and retained all the while by him."

It is asserted however that there was a constructive delivery of the property. I do not question that under certain circumstances there can be a constructive delivery of property in order to make a gift inter vivos complete. The most common instances of constructive delivery are where the alleged donor retains an interest in the property. The donor in the present case, assuming the correctness of the positions of the alleged donee, retained an interest in the Crowell Elevator stock and the bank account. In order to have a constructive delivery the evidence must show that all the elements of a gift inter vivos were present except a manual delivery, and that a manual delivery was not made simply because it involved only a partial interest. A constructive delivery of a partial interest in property requires proof that the transfer of a present interest was intended. But where, as here, all the evidence shows an intent to transfer an interest only on the death of the donor, there can be no delivery, either actual or constructive, sufficient to complete a gift inter vivos. A constructive delivery arises when every essential element of a gift inter vivos has been established and actual delivery is not made because of an impossibility to do so. I submit that all the evidence shows the intent of Rena S. Milligan to make a gift effective at her death. The subse-

quent conduct of the donor and donee sustains this conclusion. In addition thereto the donee of the elevator stock and the bank account expressly testified that this was the intention of the parties and that any right she had in them was to arise on the death of Rena S. Milligan. No gift inter vivos can be established by such evidence. The majority opinion states that the statements of Crowell to the effect that the donor intended to control the property in her lifetime and to treat it as her own until her death "were obviously his conclusions." Crowell was a witness called by the alleged donee. No objection was made to this evidence. It is clear, also, that his conclusions, if such they be, were sustained by the evidence as a whole and the admitted conduct of the parties over the years after the gift inter vivos was alleged to have been made. The majority opinion sustains the gift, in part at least, on statements made by the donee. I submit that if a gift inter vivos can be so established, a method is provided for the defrauding of estates that has been heretofore forcibly barred by our decisions. It is very obvious that these statements of the donee were her conclusions for the reason that the record shows she knew nothing of the details of the purported gift until after the death of the alleged donor. It is evident also that the alleged admissions of the donor were as consistent with a testamentary disposition of her property as with a gift inter vivos.

My position can be summarized in the language of the court in Mercantile Bank v. Haley (Mo. App.), 179 S. W. 2d 916, wherein it is said: "It is no doubt true that Wamsley wished to avoid an administration of his estate and sincerely thought that he had arranged his affairs in such a way as to accomplish that result. Likewise, we appreciate the fact that such a desire would have been entirely consistent with an intent to create a joint tenancy in the account. The trouble is, however, that in his misunderstanding of the situation, he hoped to avoid an administration while at the same time re-

serving to himself the power to make a testamentary disposition of his estate. The latter, of course, was entirely inconsistent with an intent to create a joint tenancy in the account; and we must therefore hold that for the want of a completed gift to Mackey of a present joint interest in the account, no joint tenancy was created, and the balance remaining on Wamsley's death, instead of belonging to Mackey as the surviving codepositor, became a part of Wamsley's estate, * * *." See, also, Young v. McCoy, 152 Neb. 138, 40 N. W. 2d 540.

The record clearly shows, in my judgment, that Rena S. Milligan never intended to convey a present interest in items 1 and 2 to the alleged donee. While the letter of October 25, 1947, might indicate it, the record clearly shows her intent was otherwise. Surely a letter has no greater dignity in court as evidence than a formally executed and delivered deed, or bill of sale, which we have repeatedly held to be subject to investigation upon competent evidence as to the intent of the grantor in making delivery. I do not doubt that Rena S. Milligan had a donative intent,—an intent to give at the time of her death,—but not an intent to give a present interest in the property to the donee during her lifetime. The fact that she did not deliver the railroad bonds to the alleged donee when all parties agree that she retained no interest therein is some evidence of her overall intent to make a testamentary disposition of her property in violation of the will statute.

Having these views I respectfully dissent from the contrary holdings of the majority opinion and I would affirm the judgment of the trial court.